EVARTSON K. SMITH *v.* E. H. AND S. H. MARTIN.

November Term, 1917.

Present: WATSON, C. J., HASELTON, POWERS, TAYLOR, and MILES, JJ.

Opinion filed January 23, 1919.

*Fraud—Misrepresentations—By Officers of Corporation—Right of Reliance—Knowledge of Falsity—Estoppel of Party Deceived to Deny Truth—Expression of Belief—Jury Question—Access to Sources of Knowledge—Duty to Discover Fraud—Amount of Damages—Sufficiency of Evidence—Excessive Verdict—Setting Aside or Remittitur—Verdict Affected by Passion or Prejudice—Setting Aside—Evidence—Annual Statement of Corporation—Damages—Scienter—Hearsay—Predication of Testimony On—Remoteness Of—Appeal and Error—Burden of Showing Prejudicial Error—Instructing Jury to Disregard Evidence Improperly Received—Questions Reviewable—Harmless Error—Trial—Motion to Strike Out Testimony—Failure to Meet Offer of Proof.*

Plaintiff, an employee of the company of which the defendants were officers and stockholders, purchased stock therein relying upon the representations of the defendants that a balance sheet, used as an annual statement of the company, showed its true financial condition. Plaintiff, in the course of his duties, had prepared the balance sheet from the books of the company, and knew that a small item therein was incorrect. *Held,* that, while plaintiff could not rely upon the representation as to the truth of the item he knew to be incorrect, he was not thereby estopped from denying the truth of the representations as to other items, of the falsity of which he was ignorant through no fault of his own.

The evidence was sufficient to justify the finding that the defendants knew that their representations were false, or, at least, intentionally gave currency to mere belief as knowledge, in which case the question was one of fact for the jury.

The question whether the plaintiff understood that one of the defendants, in making the representations, was expressing nothing more

than his belief as to the financial condition of the company, was for the jury.

The fact that the books of the company were open to the plaintiff, and he knew all that they disclosed, did not bar him from relying on the representations of the defendants, because the books did not show the true state of the company's affairs.

Where one has been induced to enter into a contract by fraudulent misrepresentations, it is no defence that, but for his own negligence, he might have discovered the wrong and prevented its accomplishment.

Where all the evidence is before the Supreme Court on an exception to the refusal of the trial court to grant a motion to set aside a verdict on the ground that the verdict is contrary to instructions or wholly unsupported by the evidence, the general rule that such motions are addressed to the discretion of the trial court does not apply, and the question is reviewable.

The trial court erred in refusing to set aside the verdict or to order a remittitur on the ground that the evidence was insufficient to sustain the same.

If the trial court was satisfied that the verdict was excessive, in its discretion, it could have set it aside and awarded a new trial, or it could have determined what would be a reasonable recovery, and ordered that the motion to set aside the verdict be overruled if the plaintiff should remit the excess, and it could have adopted the latter course even if it did not clearly appear just what the excess of the verdict was.

Where an excessive verdict has been rendered through bias, passion, or prejudice, the error taints the whole verdict, and cannot be cured by a remittitur, but the defendant is entitled to a new trial as matter of right.

The annual statement used by one of the defendants in representing to the plaintiff the financial condition of the company was admissible in evidence against him.

The record of the meeting of the directors of the company at which the annual statement was received as a report of the treasurer for the preceding year, and testimony that one of the defendants presided at the meeting, were admissible against him as bearing upon his acquaintance with the affairs of the company and with the contents of the statement.

It is not enough that the excepting party allege error in the admis-

sion of evidence, but the burden is upon him to show that he was prejudiced thereby.

Error in the admission of evidence cannot be cured by instructing the jury to disregard it.

The determination of the question of the remoteness of evidence ordinarily rests in the discretion of the trial court and is not reviewable, but the circumstances may make it a question of law.

Considering the nature and extent of the company's business, the testimony of the bookkeeper for the assignee of the company that he made a careful examination of the company's books in December, 1913, and that the creditors received eighty-eight per cent. of their claims, was too remote, and was not admissible as tending to show the value of the stock at the time the plaintiff purchased it in February, 1913.

The fact that material testimony does not fully come up to the offer of proof affords no basis for a motion to strike it out.

Testimony of an attorney that prior to January, 1913, his firm had various bills for collection against the company, that they always notified the company of the same, and that it was necessary to sue the company in the latter part of 1912 and the fore part of 1913, was admissible as bearing on the question of the defendants' knowledge of the financial condition of the company.

The admission of testimony by the plaintiff that with his school training only it was not possible for him to take up the company's system of bookkeeping without instruction, was harmless to the defendants.

Testimony of the plaintiff, on redirect examination, referring to the statement of bills payable made by him at defendants' request, that, long after he purchased the stock, he found the statement was incorrect, was not inadmissible as resting on hearsay, as the only importance of the inquiry was to show when he discovered the error, and not the fact of its existence.

ACTION OF TORT for deceit in the sale of forty shares of the capital stock of a corporation. Plea, the general issue. Trial by jury at the September Term, 1916, Franklin County, *Stanton*, J., presiding. Verdict and judgment for the plaintiff against both defendants. The defendants excepted. The opinion states the case.

*E. A. Ayers, J. W. Redmond* and *Elmer Johnso*: for the defendants.

The plaintiff is estopped to deny the truth of the representation on which he relies. *International Paper Co.* v. *Bellows Falls Canal Co.*, 88 Vt. 93, 100; *Boynton* v. *Hunt*, 88 Vt. 187; *Hicks & Co.* v. *Cram et al.*, 17 Vt. 455; *Montpelier & Wells River R. R.* v. *Langdon*, 45 Vt. 144; *Strong* v. *Ellsworth*, 26 Vt. 373; *Holloran* v. *Whitcomb*, 43 Vt. 307; 2 Hermon, Estoppel and Res Judicata, § 735; *Cady* v. *Owen*, 34 Vt. 598; *Continental Bank* v. *Bank of the Commonwealth*, 50 N. Y. 575, 583; *Locklin* v. *Davis*, 71 Vt. 321.

It is well settled that where the means and sources of knowledge are *equally* open to each party, one of them has no right to rely on the statements of the other. *San Jose Commissioners* v. *Younger*, 29 Cal. 176; *Yeates* v. *Pryor*, 11 Ark. 58; *Hamilton* v. *Ford*, 46 Ark. 245; *Brown* v. *Bledsoe*, 1 Idaho 746; *Leavitt* v. *Fletcher*, 60 N. H. 182; *Rockafellow* v. *Baker*, 41 Pa. 319, 80 Am. Dec. 624; *Pratt* v. *Philbrock*, 33 Me. 17; *Slaughter* v. *Gerson*, 80 U. S. (13 Wal.) 379; *Farnsworth* v. *Duffer*, 142 U. S. 43; *Andrus* v. *St. Louis Smelting, etc., Co.*, 130 U. S. 643.

Error in the admission of evidence cannot be cured by instructing the jury to disregard it. *Conn. & P. R. R. Co.* v. *Baxter*, 32 Vt. 805; *Hall* v. *Jones*, 55 Vt. 297; *Norton's Admr.* v. *Perkins*, 67 Vt. 203; *Wing* v. *Chapman*, 49 Vt. 33; *Grout Bros.* v. *Moulton*, 79 Vt. 122; *Viles* v. *Barre & M. Traction Co.*, 79 Vt. 311.

*D. G. Furman* and *Warren R. Austin* for the plaintiff.

Directors or other officers are liable for actionable fraud where they induced the purchase of stock in the corporation of which they are such officers by means of reports or prospectuses containing false statements as to the condition or affairs of the corporation. *Charles Lehman-Charley* v. *Bartlett*, 120 N. Y. S. 501, 135 App. Div. 674; *Rives* v. *Bartlett*, 141 N. Y. S. 561, 156 App. Div. 552; *Morgan* v. *Skiddy*, 62 N. Y. 319; *Houston* v. *Thornton*, 122 N. C. 365, 65 Am. St. Rep. 699; *Cheney* v. *Dickinson et al.*, 96 C. C. A. 314, 172 Fed. 109, 28 L. R. A. (N. S.) 359; *Trimble* v. *Reid*, 19 Ky. Law Rep. 604, 41 S. W. 319; *Ward* v. *Trimble*, 19 Ky. Law Rep. 1801, 44 S. W. 450; *Trimble* v. *Ward*, 97 Ky. 748, 31 S. W. 864; *Hubbard* v. *Weare*, 79 Iowa **678.**

TAYLOR, J.   This is an action of tort for deceit in the sale of forty shares of the capital stock of the H. F. Martin & Son Company. The defendants severally answered a general denial. There was trial by jury, with verdict and judgment for the plaintiff against both defendants for $4,398.90 damages and costs. Both defendants bring exceptions.

Early in 1910 the H. F. Martin & Son Company, a corporation hereinafter called the company, was organized and commenced a retail hardware and plumbing business at Swanton, Vermont. Defendant E. H. Martin was president and defendant S. H. Martin, treasurer and general manager of the corporation. The original capital stock of the corporation was $10,000, of which $8,000 was sold and fully paid. The balance remained as treasury stock until the time of the transaction here involved. E. H. Martin lived in Burlington, Vermont, and was an officer and traveling salesman of the Burlington Grocery Company. He had been in the mercantile business many years, and in the business of the grocery company made regular visits to Swanton and neighboring towns "twice in two weeks." He went to Swanton at other times to attend the meetings of the corporation. When in Swanton he visited the store and office of the company, and, among other things, examined the bills payable book, the by-laws of the corporation requiring all bills to be approved by him as president before payment. S. H. Martin lived in Swanton and had the general management of the business. At the time plaintiff purchased the stock he knew of the relation of both defendants to the business.

The company did a general retail hardware business and quite an extensive plumbing and heating business, employing from six to eight men outside the store. It employed a bookkeeper, but S. H. Martin kept the cash book and blotter, received and opened the mail, handled all the money, and had general oversight of the bookkeeping. From the time the company began business a double entry system of bookkeeping was in use. The system required that bills of goods purchased should be entered in the bills payable book, whence they would be credited to the respective sellers. The total of such bills at the end of each month would be posted from this book to the debit of merchandise account and to the credit of accounts payable in the private ledger. Among the other books employed were a cashbook, a salesbook journal, and a blotter. All the credit business

of the corporation was charged in the salesbook journal, and the total of such sales each month was credited to merchandise account and charged to accounts receivable in the private ledger. All cash transactions were supposed to be recorded in the cashbook, and from it the bookkeeper obtained all the items relating to such transactions, which he posted to other accounts. The system contemplated a monthly trial balance.

Plaintiff entered the employ of the company as bookkeeper December 26, 1912. He was then about 24 years of age, a graduate of a business college where he had been educated in keeping accounts. He had been out of school a year, but had had no actual experience in bookkeeping. He had studied and practiced in school a system of bookkeeping somewhat similar to that employed by the company, but testified that he was "rusty" on the subject of bookkeeping. No posting of the books had been done for the two months before the plaintiff entered the employ of the company. He was required to post up the books and make an annual report before January 1, 1913, to be submitted to the stockholders at the annual meeting, which under the by-laws should be held January 3, 1913. This report was to be in the form of a trial balance, and, as the plaintiff knew, it was first necessary to ascertain that all invoices of merchandise purchased were recorded in the billbook. Plaintiff knew nothing about the bills payable except what appeared from the books of the company and what S. H. Martin told him. The evidence at this point was conflicting. Plaintiff testified that Martin directed him to the bill file and handed him some other bills, all of which he posted, but that bills later came to light of which he had no knowledge. Martin testified that the bills were kept part on a file in the company's office and part in the desk used by the bookkeeper, and that he showed the plaintiff where they were and directed him to post them to the billbook. Bills owing to the amount of $2,346.06 were not posted, which falsified the account of bills payable and the statement of the standing of the company to that amount. Sums aggregating $211.76 had been paid by the company on account of bills owing that were not entered in the billbook. They appeared as items of credit in the cashbook, and, as the system required, were posted by the plaintiff to the debit side of the proper individual accounts; but, as the corresponding item did not appear on the other side of the accounts, they erroneously appeared as due the company. In

making up the annual statement these items were included in accounts receivable and falsified the statement as to such accounts to that extent. With all errors corrected, the statement should have shown a net loss of $1,350.90, instead of a net gain of $1,207.38, and the net worth of the company $6,841.42 as of December 31, 1912, instead of $9,207.38.

About the time the plaintiff entered the employ of the company the defendants decided to increase the capital stock to $15,000 and to dispose of the treasury stock and $2,000 of the additional stock. Some time shortly after the plaintiff made up the annual statement, S. H. Martin opened the negotiations with him to purchase the stock. At this interview Martin told the plaintiff he was thinking about taking in another partner, asked him how he liked the business, and whether he would like to go in or not; to which the plaintiff replied that he did not know anything about the business and did not know whether he would like it or not. About a week later E. H. Martin spoke to the plaintiff about the matter. Plaintiff told him that before he bought any of the stock he (plaintiff) would have to get the consent of his father. Still later plaintiff, his father, and the defendants met with reference to the matter. Defendants had the annual statement which was shown to plaintiff's father. S. H. Martin pointed out "what a great business it would be" for the plaintiff to go into, and said the paper produced was a true statement of the standing of the company; showed what a "great business" they did that year and had been doing for three years.

Plaintiff's father inquired as to the firms the company was dealing with and the amount owed each; and at E. H. Martin's direction plaintiff prepared from the books an itemized statement of bills payable and took it to his father. This statement showed the same total of bills payable as the annual statement. As an inducement to the purchase of the stock it was proposed to make plaintiff treasurer, secretary, and assistant manager of the company at a salary of $1,000 a year if he "come in." As a result of the negotiations the plaintiff said if what the defendants represented to his father was true, he would take the stock; and thereupon defendants reaffirmed the truth of their statements. Plaintiff took and paid for the stock $2,000 February 13 and the balance on March 6, 1913, relying, as he testified, upon defendants' statements. On February 26th S. H. Martin resigned as secretary and treasurer, and the plaintiff was elected

to fill the vacancy and also as assistant manager of the company. He acted as such and kept the accounts until December 16, 1913, when he resigned. The company was then in failing circumstances, and early in the following January made an assignment for the benefit of its creditors, under which the affairs of the corporation were liquidated and the creditors received 88 per cent. of their claims. The plaintiff claimed that the stock was worthless when he purchased it, and the jury evidently awarded damages on that basis.

The questions first briefed arise under the defendants' motion for a directed verdict.

It is insisted that as against both defendants plaintiff is estopped to deny the truth of the representation relied upon that the balance sheet was a true statement; showed the true standing of the company. The argument is that plaintiff made the balance sheet as a part of his duties as bookkeeper, which he now claims to have been false; that at the time he knew that it materially falsified the financial standing of the company; that he knew that it was to be shown to the directors, including E. H. Martin, to show the true condition of the company; that he knew E. H. Martin had little opportunity to acquaint himself therewith; that he knew that the amount therein falsely shown to have been earned was credited to profit and loss; that, when the defendants during the negotiations for the purchase of the stock made the representations relied upon, he knew they were false, but kept silent; and that the defendants, especially E. H. Martin, were ignorant of the falsity of the statement.

The record shows that there was evidence tending to support these claims; but there was also countervailing evidence. The facts concerning the plaintiff's knowledge of the falsity of the statement were these: In closing the books preparatory to making the balance sheet he discovered what already appears with reference to the error in accounts receivable. He testified that he knew that this indicated a mistake, and called S. H. Martin's attention to the accounts making up the item of $211.76; that Martin said the accounts were settled; that there were bills somewhere on his desk to balance the accounts which he would look up and hand to him; that the bills were not produced. and to make the balance sheet agree with the company's books the $211.76 had to appear as so much due the company.

If the falsity of the statement was confined to the item of $211.76, the plaintiff could not recover, as he knew the error existed, and could not, to that extent, rely upon the truth of the defendants' representation. But this was a comparatively small part of the error in the statement, and it appeared through no fault of the plaintiff. The statement was not his, but one that the treasurer, acting for the directors, was required to make. He did precisely what he was employed and directed to do—post the books of the company and make therefrom a balance sheet. As to this item his silence was not culpable. *Locklin* v. *Davis,* 71 Vt. 321, 45 Atl. 224. He knew that S. H. Martin was aware of the discrepancy and had good reason for supposing that E. H. Martin was also not ignorant of it. But, however that may be, assuming, that as to this item, standing alone, he would be estopped to deny the truth of the representations, it does not follow that he is estopped from relying upon the representations as affected by the discrepancies in the statement of which he was ignorant. He knew that the assets of the company were less by $211.76 than the balance sheet showed, and was in as good a position to judge therefrom the value of the stock as if the error had been corrected. The fraud upon him inhered in the major discrepancy in the balance sheet, of which he was ignorant through no fault of his. No principle of equitable estoppel requires us to hold that the defendants should escape the consequences of fraudulent representations merely because such representations could in part be excused as not culpable.

This disposes of the further claim that the plaintiff cannot recover because he admits that he was not deceived by the representations. Defendants argue that the plaintiff was not deceived by the representation that the balance sheet was "a true statement, the true standing of the company," because he admitted that at the time it was made he knew that it was false. The argument is suggestive of paying "tithe of mint and anise and cummin," while omitting "the weightier matters of the law." The merit of the claim is its ingenuity; but it regards form, and not substance. Properly regarded, the admission comes far short of what the defendants claim for it. What the plaintiff admitted was that he knew that the balance sheet was wrong to the extent of $211.76; but he strenuously insisted that he had no knowledge of any error or falsity in the statement in

other respects. In fact, it sufficiently appears that he had no means of knowing or discovering any further error.

It is urged that the plaintiff cannot prevail against either defendant, and especially not against E. H. Martin, because there is no evidence that he knew the falsity of the claimed representations. There was sufficient evidence, direct and circumstantial, to take the case to the jury as to both defendants on the question of *scienter*. It will be unprofitable to review the evidence in detail. Suffice it to say that both were directors of the company. The gist of representation made to the plaintiff was that the company had, during the previous year, made the gain shown by the balance sheet, when in fact it had gone behind some $1,350, a discrepancy of too great a magnitude to be overlooked in a business of no larger capital. Both defendants had personal knowledge of the bills payable—S. H. Martin in whose special custody they were, and E. H. Martin, who in the line of his duty had to and did examine and approve them. Both knew that bills in a large amount were in arrears, and that the company was without funds to pay them; that several of such bills were in the hands of attorneys for collection, and had been for some time. Both participated in handling such bills, while the negotiations with the plaintiff were pending, in a manner to conceal from him as bookkeeper the fact that the company was in financial difficulty. They co-operated in inducing the plaintiff to put his money into the corporation, thereby tiding over the crisis which even then threatened it with insolvency. These circumstances were sufficient to afford the basis of an inference that defendants knew that their representations were false, or, wanting in that, at least that they intentionally gave currency to mere belief as knowledge, in which case the circumstances made that question one of fact for the jury. *Crompton* v. *Beedle*, 83 Vt. 287, 298, 75 Atl. 331, 30 L. R. A. (N. S.) 748, Ann. Cas. 1912A, 399; *Belka* v. *Allen*, 82 Vt. 456, 462, 74 Atl. 91.

But it is urged at considerable length that plaintiff could not have understood that E. H. Martin was expressing anything more than his belief, and could not have relied upon his representation as being of knowledge, as distinguished from belief. However, this was a question for the jury. Plaintiff knew, of course, the manner in which the balance sheet was made up, but he did not know the extent of Martin's acquaintance with the

business nor the means taken to verify the statement. Again looking beyond the form to the substance of the representation, he might reasonably suppose that the president of the corporation, in touch with its affairs to the extent the evidence showed he was aware, spoke as of his own knowledge, when he in effect assured him that it had earned a good profit during the preceding year and had a substantial surplus to its credit.

It is further claimed that plaintiff cannot prévail against either defendant, because the sources of knowledge in respect of the correctness of the balance sheet were open and accessible to the plaintiff, equally as to S. H. Martin, and even more so as to E. H. Martin, and so he had no right to rely on the claimed representation that the balance sheet was ''a true statement, the true condition of the company.'' Defendants assert, citing numerous cases from other jurisdictions, that it is well settled that, where the means and sources of knowledge are equally open to each party, one of them has no right to rely on the statements of the other. But here the means and sources of knowledge were not equally open to the parties. Plaintiff's only means of information was the company's books. He knew all that they disclosed, and was misled thereby because they did not show the true state of the company's affairs. So far as the books showed, the balance sheet was a true statement. A further and sufficient reason for overruling this exception is that, however the rule may be elsewhere, it is not followed in this State. The well-settled doctrine of our own cases is that, when it is established that a plaintiff has been induced to enter into a contract by fraudulent misrepresentations, it is no excuse for the defendant nor does it lie in his mouth to say, that the plaintiff might, but for his own neglect, have discovered the wrong and prevented its accomplishment. *Maidment* v. *Frazier,* 90 Vt. 520, 98 Atl. 987.

Defendants excepted to the action of the court in overruling their motion to set aside the verdict. The grounds of the motion now relied upon were: (1) The damages are excessive, and not warranted by any evidence in the case; (2) the maximum damage that plaintiff could recover, if the case had been otherwise made out, does not exceed $800. It sufficiently appears that in fixing damages the jury found that the stock was worthless when the plaintiff bought it. Plaintiff contends that the question is not reviewable, because the motion was not based upon the claim that the verdict was without any supporting evidence.

In *French* v. *Wheldon*, 91 Vt. 64, 99 Atl. 232, we recognized the well-settled rule of our cases that a motion to set aside a verdict as against the evidence or against the weight of the evidence is addressed to the discretion of the trial court, and not reviewable when there is nothing to show that such discretion was withheld or abused, but held that, where all the evidence is before this Court on an exception to the action of the trial court in denying such a motion based on the ground that the verdict is contrary to instructions or wholly unsupported by the evidence, the rule as to discretion does not apply and the question is reviewable. In essence the first ground of this motion is that the verdict is without any supporting evidence and brings the question within the rule of *French* v. *Wheldon.* Defendants challenge the plaintiff to point out any such evidence. This plaintiff's counsel undertake to do by directing our attention to plaintiff's testimony wherein he testified that, if the balance sheet had been a correct statement of the financial condition of the company, the stock would have been worth par or better; but, taking into account the various discrepancies later discovered and testified to by him that falsified the balance sheet, it was his opinion that the stock was not worth anything at the time he bought it. This was some evidence tending to support the verdict, and would justify the court in overruling the motion unless, in their discretion, they determined that it should be set aside as against the weight of the evidence.

It remains to consider whether the refusal to set aside the verdict was a proper exercise of judicial discretion. The questions when the trial court should interfere to set aside a verdict as against the evidence, or when the reviewing court should reverse the action of the trial court in such cases, are especially delicate and often perplexing. Primarily it is the peculiar province of the jury to construe the evidence and determine its weight; and doubt in this regard will always be resolved in favor of the verdict. But cases sometimes arise when it is clear that the jury has gone astray and has either acted through passion or prejudice, or has been misled into adopting a mistaken view of the merits of the case. To allow such a verdict to stand when challenged by proper motion makes the court a party to the injustice and brings discredit upon the whole judicial system. We have carefully examined the evidence bearing upon the question of damages, and are forced to the conclusion that a manifest

injustice would result if this verdict is allowed to stand.   The most that the plaintiff can claim as the value of the stock, if the financial condition of the company had been as represented, is that it would have been worth $115.09 per share.   He testifies that it would have been worth par or better, and his estimate is supported by the balance sheet which showed that the stock had a book value of $115.09 per share.

On the issue as to its actual value we have his estimate that it was worthless based on the discrepancies discovered in the accounts.   In answer to the challenge to point out evidence to warrant the verdict he refers us to the errors in bills payable and accounts receivable, the fact that there was a net loss in 1912 instead of a net gain, and the evidence relating to plumbers' salaries, clerk's hire, and bookkeeper's hire being "included in the apparent assets of the firm."   Our attention is directed to evidence claimed to show that of accounts receivable, shown by the balance sheet, from $300 to $400 were uncollectible; that the accounts payable were too small by $2,345.06; that instead of a net gain of $1,207.38 for the year, there was a net loss of $1,350.90; that a supposed surplus of $192.32 did not exist. Plaintiff totals these items and secures $5,496.66 as "total damaging falsification."   In addition he claims that the credit balance of merchandise account was falsified to an amount that cannot be stated with exactness by including therein the compensation of the plumbers, the clerk, and the bookkeeper, and that, taking this into account with the other matters, there was ample basis for his estimate that the stock was worthless.

In this connection it is well to note that the bookkeeper who instituted the company's system of bookkeeping was employed to go over the books and check up all errors.   He was called as a witness, and testified that, after correcting all errors, including those that plaintiff claimed, the true financial condition of the company on December 31, 1912, as shown by the books, was:

Total assets ........................$13,584.25
Total liabilities ...................... 6,742.83

Net worth ..........................$ 6,841.42

—making the book value of the capital stock as of that date $85.52 per share.

The remarkable discrepancy challenges a careful examination of the respective claims.   We do not have to look far to discover the trouble.   The sums representing net gain and net loss play no part in ascertaining the net worth of the company. Correcting the balance sheet in the matters complained of by the plaintiff, and giving him the benefit of the maximum amount claimed, the books would show:

| | |
|---|---:|
| Total assets | $13,268.87 |
| Total liabilities | 6,615.23 |
| Net worth | $ 6,653.64 |

—or within $187.78 of what the defendants claimed the books showed as the net worth of the company.   In arriving at this result we disregard plaintiff's claim respecting errors in the merchandise account, as the record plainly shows that the jury should have done.   A great deal was made during the trial of a supposed discrepancy in the books due to the fact that plumbers', clerk's, and bookkeeper's salaries appeared in the merchandise account.   It was said there, as here, that the exact amount of error occasioned thereby could not be ascertained.   How this affected the jury is known only as it is reflected in their verdict. There is no mystery about the matter, however, and the defendants attempted to show by their testimony that their method of carrying these accounts did not affect the final result shown by the balance sheet.   An examination of the books, which were in evidence and are before us, shows that such was manifestly the fact.

Defendants carried an expense account in which general items of expense were charged.   The nature of the business and the system of accounts made it convenient, and, as to certain employees, a practical necessity, that the merchandise account should be *charged* with employees' wages.   For example, they did a plumbing job.   The materials used had previously been charged to merchandise account.   When completed they would charge the contract price to the customer and credit the same to merchandise account.   This amount would include what was received on account of the plumbers' wages while on the job; so it would be proper that the amount paid to them for wages should be charged to the account.   The balance at the end of the year would show the profit or loss on account of merchandise, and would go to the proper side of the profit and loss account.

If wages had been *charged* to the expense account, they would ultimately reach the profit and loss account and produce the identical result in the trial balance. It must be remembered that this was a double entry system of bookkeeping, affording the usual checks and balances.

It is true that the fair cash value of the company's assets might vary from their book value, but plaintiff did not show that the stock in trade was overvalued in the inventory, and only claimed that, at the most, $400 of the accounts receivable were uncollectible. These two items made up a large percentage of the assets. On the evidence the jury could not well have found the actual value of the stock in February and March so very much below its book value on December 31st preceding. Taking this as the actual value of the stock, the plaintiff would have been entitled, on the most favorable view of the evidence, to a verdict for about $1,400. In attempting to account for the excessive verdict, it may be significant that the court admitted, as bearing upon the question of damages, evidence of how the business was conducted in 1913 and the result already referred to. Though the court attempted to charge this evidence out of the case and told the jury they were not to consider it, there is good reason to believe that their verdict was in part, at least, influenced thereby.

In disposing of the motion the court stated the tendency of the evidence on the question of damages and expressed grave doubt as to what should be done. Referring to the possibility of ordering a *remittitur* it was said: "To order a *remittitur* entered, however, to cut this sum down to $600 or $800, wouldn't meet with our approval. We should not feel that we were doing justice to do that, and yet we must do that if we order it at all, as we view the evidence. There would be no logical ground for making it a larger sum, as we understand the evidence. This case is going to the Supreme Court. That Court can do this work, if it comes to it, if the case is otherwise made out."

These observations justify what otherwise might seem to be a digression. The trial court evidently took a mistaken view of its authority to undo the wrong wrought by the verdict. If satisfied, as it apparently was, that the verdict was excessive, two courses were open to be exercised in its discretion. It could order the verdict set aside and award a new trial. Or, as an alternative, it could determine what, on the evidence, would be a reasonable recovery, and order that the motion be overruled, if

the plaintiff within a time named should remit the excess of the verdict above that sum; otherwise that the motion be sustained, and the verdict set aside. The court was evidently of the opinion that it could not adopt the latter course unless it clearly appeared just what the excess of the verdict was. Countenance for this view is found in *Tarbell* v. *Tarbell,* 60 Vt. 486, 15 Atl. 104, where *Veazey,* J., speaking for the Court says: "A *remittitur* cannot be allowed and forced upon the defendant unless it clearly appears just what the excess of the verdict was. The court must be able to see and must determine this, and may not assume it." But it was unnecessary to the decision of the question then before the Court to give a general rule applicable to such cases. The parties agreed as to what the excess was, leaving for decision only the question whether the error could be corrected in this Court. As a statement of the general rule the language employed was unfortunate. It imports a degree of certainty that is not, and cannot well be, required in practice. A *remittitur* could seldom be allowed within the letter of the rule thus stated. Courts everywhere make the alternative order in case of excessive verdicts without attempting to determine what the verdict should have been with any such degree of certainty. In fact, the *remittitur* is frequently employed in personal injury cases where it would be impossible to arrive at the result by computation. In such case the court does not assume to exercise the functions of the jury. It does not assess the amount of plaintiff's damages, but only determines what, if any, part thereof should be allowed to stand in case he chooses to remit the excess. In other words, it undertakes to determine a sum which on the evidence would be just to the defendant, and offers the plaintiff the alternative of taking a judgment in that amount or a new trial. The thing to be guarded against, of course, is the danger of injustice to the defendant by forcing upon him an excessive judgment when the excess in the verdict cannot be accurately determined, thus invading his constitutional right to a jury trial. But this danger can be avoided by fixing the amount on the acceptance of which by the plaintiff the new trial will be denied at the minimum sum which a jury, uninfluenced by improper evidence (or, on the other hand, when given the right to consider improperly excluded evidence), could reasonably be expected to allow, and which the court can clearly see is not excessive. See *Triangle Lumber Co.* v. *Acree,* 112 Ark. 534, 166

S. W. 958, Ann. Cas. 1916B, 773; and generally cases digested in the American Digest, Decennial Edition, under Appeal and Error, K. N. 1140.

The rule under consideration is one of practice merely. The tendency of modern times has been to liberalize rules of practice in the direction of avoiding unnecessary retrials. In so far as *Tarbell* v. *Tarbell* does not accord with what we have said on the subject of *remittitur*, it is not to be taken as stating the rule followed in this State. It seems best to notice in passing that the authority to order a *remittitur* is subject to the limitation that the court should be satisfied that the excessive verdict was not the result of passion or prejudice. The general rule is that where an excessive verdict has been rendered through bias, passion, or prejudice, the error taints the whole verdict, and cannot be cured by *remittitur*, but the defendant is entitled to a new trial as matter of right. Note Ann. Cas. 1912C, 509; 4 Sedg. on Dam. (9th ed.) sec. 1331.

E. H. Martin excepted to the admission of the annual statement referred to above as evidence against him. But he was not entitled to have its use thus restricted. He made use of it in representing the financial condition of the company as already sufficiently appears. He also excepted to the admission in evidence of the record of the meeting of the directors at which the annual statement was received as a report of the treasurer for the preceding year and to the admission of testimony that he presided at said meeting. The ground of objection was that the evidence was immaterial. Neither exception is sustained. The record showed, among other things, that the report was examined and adopted, and the balance of profit credited to profit and loss. The evidence bore upon his acquaintance with the affairs of the company and with the contents of the statement, and was material.

Several exceptions were taken to the admission of certain books and papers produced by the head bookkeeper of Walker & Pratt Manufacturing Company of Boston, with which the H. F. Martin & Son Company had an account that entered into the annual statement, for the purpose of showing how much was due the former on December 31, 1912. Defendants objected to the books and papers being used, or the witness testifying therefrom, on the ground that they were not original entries. The court overruled the objection and permitted the witness to refer to

them and state the amount due. It would not be profitable to discuss the merits of these exceptions since no question is made as to the amount actually due. The sum testified to and claimed by the plaintiff was adopted by the expert in making his corrected balance sheet, which the defendants earnestly maintain in their brief there was no evidence in the case tending in any way to contradict. It is not enough that the excepting party allege error. He assumes the burden of showing that he has been prejudiced thereby. This the defendants do not undertake to do. It follows that if the court erred in admitting the books and papers, which is not decided, the error was harmless.

Under exception, the plaintiff was permitted to show by the bookkeeper who kept the books for the assignee of the company in substance, that he made a careful examination of the company's books in December, 1913; that while thus engaged the company made an assignment for the benefit of creditors; and that the creditors received 88 per cent. of their claims. The evidence was received on the question of damages as tending to show the value of the stock at the time plaintiff purchased it. In its charge the court instructed the jury not to consider this evidence; that it was too remote and did not tend to show what the value of the stock was at the time it was sold. Plaintiff excepted to the action of the court in withdrawing the evidence from the jury.

Manifestly the error, if such it was, was not cured by the charge. It sometimes happens that evidence is received under a misapprehension which the court, with a full understanding of the case, would have rejected. But experience has shown that, where the trial is by jury, it is futile to undertake to erase the impression which the evidence has created. Hence our rule that error in the admission of evidence cannot be cured by instructing the jury to disregard it. *Grout Bros.* v. *Moulton,* 79 Vt. 122, 140, 64 Atl. 453. Plaintiff contends that the evidence was relevant and that the only question was that of remoteness, which was addressed to the discretion of the trial court, and so is not reviewable. It is the well recognized rule that the determination of the question of remoteness ordinarily rests in the discretion of the trial court and is not reviewable. But, as the rule implies, the circumstances may make it a question of law. Thus it may be ruled as a question of law, as in *Belka* v. *Allen,* 82 Vt. 456, 74 Atl. 91; or it may not be sufficiently remote so as

not to be admissible as a matter of law (*Richardson* v. *Baker &
Son*, 83 Vt. 204, 209, 75 Atl. 151) ; or, again, it may be so remote
that its admission would not be a proper exercise of judicial dis-
cretion. *Johnson* v. *Doubleday*, 92 Vt. 267, 102 Atl. 1038.

If the question presented here is reviewable, it is because
the case falls within the last named class. The court reached
the conclusion that the evidence could not be admitted in the
exercise of sound discretion—a result with which we fully agree.
It must be conceded, as plaintiff in effect argues, that there was
some logical connection between the condition of this company
in February and March, 1913, and its condition the following
December. But, this admitted, it does not follow that the evi-
dence was of any probative value. The argument overlooks
the distinction between *logical* relevancy and *legal* relevancy.
Legal relevancy denotes something more than a minimum of pro-
bative value. Not only must the fact proved be logically rel-
evant, but it must be "fit to be considered" as a rational basis
for inferring the fact to be proved. See 1 Wig. on Ev., sec. 28.
The law furnishes no precise and universal test of relevancy.
The question must be determined in each case according to the
teachings of reason and judicial experience. 1 Jones, Com. on
Ev. 659. When the question is as to the admissibility of evi-
dence of a fact as the basis of an inference that it existed at
a previous or subsequent time, the true inquiry in each case is:
At what point will evidence of the existence of a given fact or
state of affairs cease to be probative as to its existence at an
earlier or a later period? The established rule is that the court
will infer that the particular fact or set of facts continues to
exist so long as such facts usually, as a matter of experience,
have been found to continue. 2 Cham. on Ev. 1230. The pro-
bative value of such evidence will depend upon the length of
time intervening and the persistent or mobile nature of the sub-
ject-matter to which the inference is applied. When the subject-
matter is of a permanent character, but slightly subject to or
affected by change of condition, considerable time may elapse
without destroying the force of the inference. On the other
hand, if the subject-matter is of a changeable nature, establish-
ing its condition at a certain time would furnish no rational
basis for an inference that it was in the same condition at some
previous time, especially if the time was somewhat remote.

The question in the case at bar is not, as the plaintiff seems to regard it, the ordinary case of showing the price at which an article was sold as evidence of value. The selling price of an article is generally, if not always, regarded as having more or less reference to its value. See *Crampton* v. *Valido Marble Co.,* 60 Vt. 291, 301, 15 Atl. 153, 1 L. R. A. 120. The value of this stock at the time of the purchase depended upon the financial condition of the company at that time. Its financial condition then as compared with what it was ten months later involved so many variables that there was no logical basis for inferring the fact of the former from the proof of the latter. It was not enough, as defendants' evidence tended to show, that there was substantially the same amount of merchandise on hand at the close of the year 1913 as at the close of the preceding year. An extensive business had been carried on meantime. New goods had been purchased to replace the old. Old bills had been paid and additional bills in large amount had been contracted. Old accounts had been collected and new credits had taken their place. Question of profit or loss on a large number of individual transactions further complicated the problem. We have only to examine the books of the company to discover how utterly unreliable was the inference sought to be drawn by this evidence. With the errors claimed by the plaintiff corrected, they show a gain of $467.68 for the year 1910, and of $262.46 for 1911; a loss of $2,081.04 for the year 1912, and of $8,651.28 for 1913. The case discloses no compelling necessity to resort to the proof offered to show the condition of the company at the times in question. Monthly balances of the books were taken and the condition of the company could be ascertained therefrom at the close of any particular month with much greater certainty than to attempt to determine it by inference from that shown at so remote a time.

Defendants argue exceptions to the admission of certain evidence given by one C. W. James, a deputy sheriff, and to the refusal of the court to strike out the evidence. In the course of introducing his testimony, plaintiff made an offer which was objected to as immaterial, and the objection was overruled. The evidence, received under exception, did not in every particular come up to the offer. Whereupon defendants moved to strike it out for that reason. Defendants' exceptions are not well taken; that of E. H. Martin, because the evidence was not received as

against him, and that of S. H. Martin, challenging the admission of the evidence, because, as against him, it was clearly material. It tended to show that he concealed from the plaintiff the true condition of the company while the negotiations for the purchase of the stock were pending and bore upon the question of *scienter.* The testimony given being material, the fact that it did not fully come up to the offer afforded no basis for the motion to strike out. See *Herrick* v. *Town of Holland,* 83 Vt. 502, 511, 77 Atl. 6.

Defendants excepted to the testimony of Mr. Webster, of the firm of Furman & Webster, that during the year previous to January, 1913, his firm had various bills for collection against the H. F. Martin & Son Co.; that when the firm had such claims in hand for collection, "we always notified them that we had a claim, told them what the claim was, and asked them to pay it"; that it was necessary to sue the company in the latter part of 1912 and the fore part of 1913. The objection, which was that the evidence was immaterial, was not well grounded. The evidence, in connection with other testimony bringing these facts home to both defendants, bore on the question of their knowledge of the financial condition of the company.

Defendants excepted to plaintiff's being permitted to testify that with his school training only it was not possible for him to take up the company's system of bookkeeping without instruction. It was objected that it was for the jury to say what was possible for him to do in the circumstances. Defendants invoke the rule that excludes the expression by a nonexpert witness of an opinion upon the precise question on trial before the jury. But the question of plaintiff's ability in that regard was not an issue in the case. He had already testified that he was not acquainted with the system of bookkeeping found there, that he had had no actual experience, and that S. H. Martin instructed him how to post the books and make the annual statement. These facts were not controverted. It is unnecessary to consider whether the testimony infringed the opinion evidence rule; for, in any event, its admission was harmless.

Defendants brief a claimed exception to testimony of the plaintiff respecting the time and manner of discovering the financial condition of the company prior to the purchase of the stock, insisting that it was hearsay. But the record fails to disclose any such exception.

Defendants excepted to the plaintiff's being permitted to testify on redirect examination, referring to the statement of bills payable made by him at defendants' request and shown to his father, that long after he purchased the stock he found the statement was incorrect. The objection was that the question asked the witness to predicate his answer on hearsay testimony. The exception is not well taken. He was not asked to tell what he discovered. That may have rested on hearsay; but that he *did* discover it and *when* were facts within his own knowledge. Besides, the fact that the statement was incorrect was not disputed. The only importance of this inquiry was to show *when* he discovered the error, and not the fact of its existence.

We have noticed all exceptions briefed by the defendants. The errors affecting the question of damages necessitates a reversal to that extent.

*Judgment affirmed, except as to damages. As to that question, judgment is reversed, and cause remanded.*