## In re Erni C. Waterman's Will.

February Term, 1930.

Present: Powers, C. J., Slack, Moulton, and Willcox, JJ.

Opinion filed May 7, 1930.

*Hugh W. Hastings* for the contestant.

*Wilson, Adams & Keyser* for the proponent.

446

SLACK, J. On October 8, 1927, Erni C. Waterman executed an instrument purporting to be his last will and testament. The validity of this instrument is challenged on the ground that he was not then of sound mind, and that he was unduly influenced to make the same by his daughter, Jessie Hobbs, and his housekeeper, Mrs. Mildred Paul. The trial below was by jury, and resulted in a verdict in favor of the instrument. The case is here on exceptions saved by the contestant.

Waterman was seventy-four years old at the time of his death, which occurred October 5, 1928. He had been twice married. His first wife died in February, 1913. He remarried about four years later. His second wife died September 3, 1925. Mrs. Paul had been working in the Waterman family a short time when the second wife died, and remained with Waterman practically all of the time until his death. He was survived by two children, the Jessie Hobbs above mentioned, and another daughter, Nettie Wheelock, who is the contestant. By the terms of the instrument in question, Waterman, after providing for the payment of his just debts, etc., gave to his daughter Nettie five dollars, to Mrs. Paul two hundred dollars, and to his daughter Jessie the balance of his estate, the amount of which did not appear. Whether this was a natural or unnatural disposition of his property depends upon whose evidence is believed.

The exceptions are to the exclusion of certain evidence and to the admission of other evidence.

Arthur Jones, a witness for proponent, testified that several years before Waterman died, and he thought before Mrs. Paul began work for him, he told the witness that "when Mr. Wheelock and Nettie left him * * * * he gave them $500 and 'made them give me a credit receipt of everything I owed them' and he said the rest of my property I am going to give to Jessie." On cross-examination he testified that Waterman said nothing to him on that occasion, or later, about a will. Following this he testified that he knew a Mrs. Thurston; had been to her place several times; had been there since this contest started; and had talked with her about the case. He was then asked: "Q. Upon an occasion when you were talking with Mrs. Thurston in regard to this case, whether or not you told her that you had a talk with Erni and that in that talk he stated to you that he was going to make a will, as Mrs. Paul and Mrs.

Hobbs had planned that he—Erni—make a will and leave all the property to Mrs. Hobbs?'' This was offered for the purpose of impeachment only, and was excluded.

■ With us the general rule of practice in laying the foundation for impeachment by proof of inconsistent statements out of court requires that they should first be called to the witness' attention and the time, place, and person to whom made indicated with sufficient accuracy fairly to apprise the witness of the occasion inquired about. Whether this has been done in a particular case is for the determination of the trial court in the exercise of sound discretion. *Niebyski* v. *Welcome*, 93 Vt. 418, 108 Atl. 341; *State* v. *Glynn*, 51 Vt. 577; 2 Wig. on Ev. par. 1029. That the pending question was faulty respecting the element of time seems too clear to admit of doubt. To be sure, it specifies ''an occasion'' after these proceedings were commenced, but in the circumstances the court was justified in holding this insufficient.

The next five exceptions relate to the exclusion of certain declarations of Mrs. Paul, and, while the contestant has briefed them together, they require separate consideration.

■ The contestant says in her brief that: ''There was such a joint feeling, joint interest, joint purpose and design on the part of Mrs. Hobbs, and Mrs. Paul as to make the .declarations admissible.'' If by this is meant that the relations between these women were such that the declarations in question were admissible against Mrs. Hobbs, the claim is without the slightest foundation. To be sure, neither Mrs. Hobbs nor Mrs. Paul liked Mr. Wheelock, but the claim that they had a joint interest, purpose, and design to influence Mr. Waterman in the making of his will is mere suspicion and conjecture, so far as the record is concerned. The evidence shows the attitude of Mrs. Hobbs toward her father to have been nothing more than that of a dutiful child toward an aged parent. So the claim that she was responsible for the declarations of Mrs. Paul will be given no further consideration.

■ On cross-examination Mrs. Paul was asked the following questions respecting a talk she had with a Mrs. Minard at the latter's home: ''Q. There was an occasion when you were there when you made a statement to her that Wheelock's people wouldn't get any of Waterman's money if you could help it?'' This was excluded subject to contestant's exception.

The record shows no attempt to fix the time of the occasion inquired about. For aught that appears it might have been months after the will was executed, or even after the trial below began. It was, therefore, inadmissible either for the purpose of impeachment, to show hostility toward the Wheelocks at the time the will was made, or undue influence.

■ William Roberts, a witness for contestant, testified that he worked for Waterman six weeks beginning the middle of January, 1928, and that during that time Waterman had a talk with Wheelock in the road in front of Waterman's house. The contestant then offered to show by the witness that immediately following such talk "Mrs. Paul took Mr. Waterman to task for talking with Mr. Wheelock on that occasion, and that she also told Mr. Waterman what she should do to him if he repeated the offense." This was excluded, and contestant excepted. This question was meaningless, since it apprised no one of what it was claimed Mrs. Paul said or did on that occasion. For this reason, if for no other, it was properly excluded. But more than this, the incident took place three months after the will in question was made.

■ Loren Lund, a witness for contestant, testified that at *sometime* when Mrs. Paul was at his place he had a talk with her about Mr. Waterman's capacity to handle his business. The contestant then offered to show that "at the time Mrs. Paul stated to the witness that she was running Mr. Waterman's business, for the reason that he was not capable of doing it himself." This was excluded subject to contestant's exception. Here again the examiner failed to fix the time. If this talk was after the will was made, and it may have been for aught that appears, it had no tendency to show that Waterman was incapable of doing business when he made his will, or that Mrs. Paul had then secured control over his affairs. Furthermore, the offer does not indicate whether Waterman's incapacity to do business was due to his mental or to his physical condition.

■ Edith Minard, a witness for contestant, testified that she had a talk with Mrs. Paul about Mrs. Wheelock between three and four years before the trial, "after his (Waterman's) second wife died." The contestant then offered to show that at that time Mrs. Paul made the statement that "Nettie never would get anything, Jessie is the girl." It is now claimed that this tended to show that Mrs. Paul had then brought about

"this result"—tended to show a "purpose either accomplished, or sufficiently accomplished as to leave no doubt of its ultimate accomplishment." When it is remembered that the will was not made until a year and a half or two years later, this claim is without merit.

It is claimed, too, that this evidence tended to show hostility. But it was so remote in point of time that the court in its discretion may well have excluded it for that reason, and it will be assumed, the contrary not appearing, that it did so.

Emma Thurston, a witness for contestant, testified that Mr. Waterman and Mrs. Paul were at her place just before he went to the hospital, which was about a month before he died, and that Mrs. Paul then told her not to tell anybody that Mr. Waterman was going to the hospital. She was then asked: "Q. Did she say at that time that 'we don't want Mike's folks (meaning the Wheelocks) down to the hospital?'" This was properly excluded since it related to an occasion nearly a year subsequent to the execution of the will. It is claimed that it was admissible as tending to impeach Mrs. Paul, but, since this claim was not made below, the question need not be considered. We may say, however, that no ground for impeachment was laid. The only attempt to do so was a question to Mrs. Paul as to whether she ever told Mrs. Thurston so and so.

Marcellus Wheelock, the contestant's husband, was a witness for her. On cross-examination he testified that he had four children by a former wife, the eldest being a boy then twenty-eight years old. He was then asked: "Q. Did Mr. Waterman express to you his feeling with regard to this boy and his conduct?" and subject to contestant's exception answered: "Why, I don't know but what he did." He was then asked: "Q. This boy in fact got into pretty serious trouble and was sentenced to State's prison?" This was objected to and excluded. It is now urged that this line of inquiry was remote, immaterial, and irrelevant, and that for this reason the court in admitting the answer to the first question and permitting the asking of the other committed prejudicial error. It is enough to say regarding these exceptions that the record shows that neither the grounds now relied upon nor any others were specified in the objection, so these exceptions are not for consideration. *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 128, 130

450

.Atl. 758; *Miles* v. *Vermont Fruit Co.*, 98 Vt. 1, 14, 124 Atl. 559; *Niles* v. *Danforth*, 97 Vt. 88, 95, 122 Atl. 498; *Waterman* v. *Moody & Rogers,* 92 Vt. 218, 228, 103 Atl. 325.

 Edward Sargent, a witness for contestant, testified that he was a drover, and, as. such, had done business with Waterman for thirty years; that he had bought all kinds of livestock from him except horses; that he thought he bought a cow and some calves from him in 1927; that he saw and talked with him, he thought, in October of that year, but did no business with him at that time. He was not asked to, nor did he, state any conversation that he ever had with Waterman. He was then asked his opinion, based on the facts testified to by him, whether Waterman was of sound mind and memory in October, 1927. This was excluded subject. to contestant's exception. Assuming that the foundation was sufficiently laid to entitle the witness to give his opinion respecting Waterman's mental condition at the times when he testified to having seen and done business with him, *In re Will of Smith,* 88 Vt. 259, 92 Atl. 223, he could not give an opinion based on what he observed on those occasions as to Waterman's mental condition at a later time, which was precisely what the question called for. In effect, the witness was asked for his opinion respecting Waterman's mental condition in October, 1927, based not on what he then observed of him, but what he had observed on former occasions, perhaps months or years or a decade before. This clearly was incompetent. To be sure the witness thought he saw Waterman in October, 1927, but, if so, he did no business with him, and not enough appeared respecting that incident to entitle the witness to give his opinion of Waterman's mentality at that time based on what was then observed or transpired.

This disposes of all exceptions relied upon.

*The judgment of the county court is affirmed. Let the result be certified to the probate court.*