IN RE EDWARD H. EVERETT'S WILL.

Special Term at Rutland, November, 1932.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed May 2, 1933.

292

*W. R. Daley* (*Wilton J. Lambert* and *Rudolph Yeatman,* both of Washington, D. C., of counsel) for Grace Burnap Everett in her individual capacity.

*Warren R. Austin, E. Barton Chapin* (of Boston, Mass.) and *Collins M. Graves* (*Austin & Edmunds* of counsel) for the contestants.

SLACK, J. This is an appeal from the decree of the probate court admitting to probate an instrument purporting to be the last will and testament of Edward H. Everett, late of Bennington. A trial was had by jury in the county court which resulted in a verdict and judgment disallowing the instrument, and exceptions were filed by the proponents. These exceptions are prosecuted in this Court by Grace Burnap Everett, the widow of the decedent, who is the principal beneficiary under the instrument, in her individual capacity. The contestants are daughters of decedent by a former marriage. Their mother died in 1917.

Decedent married Grace Burnap, the widow, March 27, 1920. He was then sixty-nine years old, and thirty years older than Miss Burnap. The instrument in question was executed August 2, 1927. Decedent died April 28, 1929. There survived him, beside the widow, three daughters by his first wife: Amy E. Wing, Mary E. Turri, and Anne H. Selden, and two daughters by his second wife, Grace Elizabeth, born in 1921, and Sarah, born in 1922. He left an estate valued at $2,357,586.40, as appears from the inventory filed in the probate court. This consisted largely of stocks in different corporations. Among these were six hundred and fifty-two shares in the Edward H. Everett Company valued at $750,667.16. Under the terms of the alleged will the widow receives all of the latter stock and one-half of the residue of decedent's estate; each of his daughters by his first wife receive one-tenth of such residue, and two-tenths of such residue is placed in trust for the benefit of his daughters by his second wife. Prior to the execution of the alleged will decedent had given to his wife, outright or in trust, real and personal property valued at upwards of $3,000,000.00, and had created a trust of $90,000.00 for his daughter Grace Elizabeth, and a trust of $100,000.00 for his daughter Sarah.

The real issue below was whether the instrument in question was the result of undue influence exerted by Mrs. Everett over the decedent. But as bearing on this issue, the contestants claimed throughout the trial that decedent's condition of mind at the time the instrument was executed was such that it was completely overpowered by the will of his wife; that this was due to her conduct respecting the relations between them, her conduct respecting his and her relations toward the contestants and their families, and her interference with, and domination

of, his business and money affairs. It was claimed, too, that this conduct on her part began soon after she became acquainted with decedent and continued to the time the instrument was executed. Thus a wide field of investigation was thrown open, and it was explored with great diligence. It was not claimed that decedent lacked testamentary capacity in the sense that he was insane, nor could it be, since the undisputed evidence showed that, except for the undue influence, if any, exercised over him by his wife, he transacted his business affairs with marked skill and ability.

■ ■ While undue influence and lack of testamentary capacity are separate and distinct issues, the condition of a person's mind at the time he did a certain thing which is claimed to have been the result of undue influence is always an important question, since what would unduly influence the action of one person might have no effect whatever upon the action of another. So it is that in will cases where lack of testamentary capacity or undue influence are the grounds of contest, there are a few, and but a few, artificial rules to be applied. The great problem of whether or not the instrument offered for probate is the product of a disposing mind acting freely, in view of all the affections, sympathy, confidence, indifference and distrust, likes and dislikes, memories, purposes and anticipations engendered, it may be throughout a lifetime, demands solution through an investigation befittingly untrammeled, and the inquiries must for the most part be carried on in accordance with liberal rules of procedure. *In re Esterbrook's Will,* 83 Vt. 229, 241, 75 Atl. 1; *In re Wells' Will,* 95 Vt. 16, 113 Atl. 822; *Crocker* v. *Chase,* 57 Vt. 419. Prof. Wigmore, in his work on Evidence, Vol. 3, par. 1738 (a), states the rule thus:

> ''The existence of undue influence or deception involves incidentally a consideration of the testator's *incapacity to resist pressure and his susceptibility to deceit,* whether in general or by a particular person. This requires a consideration of many circumstances, including his state of affections or dislike for particular persons, benefited or not benefited by the will; of his inclinations to obey or to resist these persons; and, in general, of his mental and emotional condition with reference

to its being affected by any of the persons concerned. All utterances and conduct, therefore, affording any indication of this sort of mental condition, are admissible, in order that from these the condition at various times (not too remote) may be used as the basis for inferring his condition at the time in issue. The use of such data is universally conceded to be proper.''

And in subdivision (b) of the same paragraph the author continues:

''Furthermore, the *normality of the will's dispositions,* with reference to the natural and uninfluenced desires of the testator, must be investigated. That influence is 'undue,' implies in part that the testamentary disposition in controversy deviates from that which the testator under the influence of his ordinary inclinations would have made. If the tribunal can ascertain his normal tendencies and plans, a standard is found by which to test the dispositions in issue. If these harmonize with this normal standard, the charge of undue influence can have little or no support; if they diverge abnormally, there is then some inducement to examine further into the nature of the influence producing this divergence. Accordingly, to establish this normal tendency or inclination, the testator's condition of mind before and after the time in issue not only may be but must be examined; his state of affection or dislike to specific persons, and his general testamentary attitude towards them, will help to form the standard of his normal dispositions. For this purpose, his utterances indicating the state of his affections and intentions, and in particular his other testamentary acts or expressions, if any, whether prior or subsequent, may all be considered; the evidential principles already noted (Par. 'a,' *supra*) sufficing equally for this purpose. This use of such evidence is also universally sanctioned.''

■ In order to avoid a will on the ground of undue influence, the influence must be such as to destroy the free agency of the testator at the time and in the very act of making the instrument; but this does not mean that such influence must be directly exerted at the moment the instrument is executed, or within any particular time prior thereto, but rather that, whenever exerted, whether months or years before, it must still be operative upon the testator's mind in the very act of executing the instrument, and be an effective cause of the disposition made therein. *Seals* v. *Seals*, 213 Ky. 779, 281 S. W. 982; *Thomas* v. *Cortland*, 121 Md. 670, 89 Atl. 414. Inferentially, this Court recognized such to be the law in *In re Chisholm's Will*, 93 Vt. 453, 108 Atl. 393, 394, where it is said:

> "The contestants excepted to that part of the charge wherein the court instructed the jury that in order to defeat the will the undue influence must have been exerted upon the very act of making the will. The fault found with this instruction is that it gave the jury to understand that the person chargeable with undue influence must have been actively engaged in exerting such influence over the testator at the very time the will is executed. But, taken as a whole, the charge does not convey this idea. All that is meant is that the influence must have been effective at the time the will is made."

■ ■ It will be noted that Professor Wigmore says in what is quoted above that the mental condition of the testator at various times "not too remote" may be used as the basis, etc. Questions of remoteness are, to a large extent, in the discretion of the trial court, there being no arbitrary rule as to the time over which the inquiry may extend. Page on Wills, § 714. See, too, *In re Martin's Estate*, 92 Vt. 362, 104 Atl. 100. Evidence which tends to show that the beneficiary acquired control over the testator's mind before the will was made, and retained such control beyond the period at which the will was executed, is admissible, even if such evidence relates to a remote period of time. Page on Wills, *supra*.

It is said in *Smith* v. *Martin*, 93 Vt. 111, 129, 106 Atl. 666, 674:

"When the question is as to the admissibility of evidence of a fact as the basis of an inference that it existed at a previous or subsequent time, the true inquiry in each case is: At what point will evidence of the existence of a given fact or state of affairs cease to be probative as to its existence at an earlier or later period? The established rule is that the court will infer that the particular fact or set of facts continues to exist so long as such facts usually, as a matter of experience, have been found to continue. * * * When the subject-matter is of a permanent character, but slightly subject to or affected by change of condition, considerable time may elapse without destroying the force of the inference."

The foregoing principles of law are determinative of many of the questions relating to the admission of evidence.

■ The contestants claimed, and their evidence tended to show, that prior to decedent's marriage to Miss Burnap the relations between them and decedent were very harmonious and affectionate, and that he took a deep interest in them and in their welfare, but that shortly following his marriage his attitude toward them changed, that he appeared to gradually lose interest in them, came to distrust them, and on some occasions expressed a feeling of resentment and ill will toward them, and that this attitude continued down to the time the instrument in question was executed. In this situation, it was competent for contestants to show, by any legitimate evidence, the decedent's state of mind toward them, and toward his wife as far as material to the issue involved, during the entire time covered by their evidence, so the question of remoteness of the evidence, as far as time alone was concerned, need not be referred to again.

■ Letters and telegrams that passed between decedent and his daughter Mary and her husband in 1919, Contestants' Exhibits N-10 to U-13, inclusive, were received subject to proponents' exception that they were too remote, that there was

no issue respecting the relations between these parties at that time, and that they had no tendency to show the mental condition of decedent at the time the instrument was executed. It was competent for contestants to show decedent's state of mind toward Mary and her husband before the claimed change in his mental attitude occurred, and these exhibits were admissible for that purpose.

Subject to like exceptions, letters written by decedent to Mary in 1920 and the early part of 1921, Contestants' Exhibits C-14 to A-16, inclusive, were admitted in evidence. These letters were admissible for the same purpose as those already mentioned.

The same is true of Contestants' Exhibits W-8, Y-8, and A-9 to E-10, inclusive, which are letters written by decedent to Mary in 1921, except I-9 and C-10, which are letters written by decedent to Mary's husband.

A letter from Anne to decedent written in May, 1927, Contestants' Exhibit S-2, and the envelope in which it was mailed, Contestants' Exhibit T-2, were received in evidence subject to the objection that they contained self-serving declarations, and it is now claimed that they were prejudicial to proponents. There is no merit either in the claim or the exception.

On direct examination Mr. Turri, Mary's husband, testified that he and his family did not attend Anne's wedding, but that they sailed for home, Italy, on October 29, 1921, four days before the wedding occurred, and gave his reason for this. The cross-examination proceeded upon the theory that the witness had falsified respecting the reason for not attending that wedding, and that the real reason was the strained relations that existed between Anne and the witness and his family. While the witness denied this, the evidence was such as to warrant the inference that it was so.

During his redirect examination contestants offered in evidence a letter from Anne to the witness dated July 7, 1921, Contestants' Exhibit H-4, a letter from Mrs. Turri to Anne, dated July 10, 1921, Contestants' Exhibit J-4, and a letter from Anne to Mrs. Turri, dated July 15, 1921, Contestants' Exhibit K-4, ''for the purpose of rendering less probable the inference from the cross-examination that there was a lack of harmony between Miss Anne and Mrs. Turri (and Mr. Turri) which affected the making of this will and which accounted for in

some way the provisions of the will." The letters were received in evidence, subject to proponents' objection that the writers of them were in court and competent to testify; that the letters were full of self-serving declarations; and had no binding force on the contestants.

The court cautioned the jury before the letters were read that they were to consider them only as bearing on the issue of harmony between the parties, and not as proof of any facts stated therein.

Anne's letter to the witness begins, "Jule dearest," and following her explanation for writing him instead of Mary, his wife, who was then in the hospital, is the body of the letter in the last paragraph of which is this language: "Good night dear and much love and many thanks for reading this huge, enormous book of a letter." Signed, "Affectionately, Anne."

Mary's letter to Anne begins, "Anne dearest," and the closing paragraph is as follows: "This however Anne dear be sure you can always count on me and I will try to take Mother's place towards you as well as I possibly can. In my thoughts I hold you lovingly in my arms." Signed, "Mary."

Anne's reply to Mary's letter begins, "Mary dearest," and closes, "Much, much love to you dearest and to Jule and the boys." Signed, "As ever devotedly, Anne."

Such parts of these letters as we have quoted tended to show friendly and harmonious relations between the Turris and Anne at the time they were written and in the circumstances were admissible for the limited purpose for which they were admitted as against any exception saved by proponents. The exception was to the admission of these letters as a whole and not to any particular part, or parts, of them. As to the effect of such an exception, see *In re Wells' Will,* 95 Vt. 16, 26, 113 Atl. 822; *Page* v. *Cave,* 94 Vt. 306, 111 Atl. 398; and *McCurdy* v. *Flibotte,* 83 N. H. 143, 139 Atl. 367. Had the exception been limited to certain parts of the letters, it is not apparent upon what ground the admission of such parts could have been justified. They had no tendency to prove harmonious relations between these parties, and are highly prejudicial in character.

During the direct examination of Anne (Mrs. Selden), who was called as a witness by contestants, they offered in evidence a letter from her to Mr. Turri dated June 28, 1920, Contestants' Exhibit Y-7, a letter from Mary to the witness dated August 10,

1920, Contestants' Exhibit A-8, and a letter from Mary to the witness dated August 20, 1920, Contestants' Exhibit C-8, for the purpose of showing the then state of affection between the witness and Mary, and it appearing that the relations between these parties were then the same as in November, 1921, the time of Anne's wedding, these letters were admitted for the limited purpose for which they were offered, subject to the exception that letters between the contestants were inadmissible to prove decedent's lack of competency to make the will in question, or to show that he did not act on his own volition in making it; that they were inadmissible to prove any fact stated in them and that they were purely hearsay. It is enough to say regarding these letters that certain parts of them were admissible for the purpose for which they were received, and that there is nothing in any of them that could possibly have harmed the proponents.

■ ■ For the purpose of showing state of mind of decedent, one Taylor, an employee at Hotel Belmont in New York City in 1918 and 1919, testified on behalf of contestants, subject to objection and exception that the evidence was immaterial and irrelevant, that decedent and Miss Burnap occupied connecting rooms at that hotel from December 27, 1918, to January 4, 1919, and again in the latter part of 1919, and that Miss Burnap's room was charged to, and paid for, by decedent; and in connection with his testimony the hotel records, Contestants' Exhibit A-3, and a rough sketch showing the location of the rooms, Contestants' Exhibit W-2, were received in evidence. This evidence did not fairly justify the inference that the parties committed an immoral act on either occasion, the only purpose for which it had any relevancy. But assuming that it did, it was impossible for the jury to say which party was to blame. Whether an act of immorality was committed on either occasion, and, if so, who was responsible therefor, were matters of pure conjecture and speculation. The evidence was incompetent, inadmissible, and highly prejudicial, and would require a reversal except for the fact that practically the same thing had been previously testified to by other witnesses, without objection.

■ The evidence of B. J. McNaney that he took the decedent and Miss Burnap on an automobile trip up Woodford mountain in the summer of 1918; that they had a lunch with

■

them which they went across a field, out of sight of the witness, to eat; that later, just at dusk, they left the automobile and went up a little hill, out of the witness' sight, where they remained about half an hour, was received to show state of mind of decedent and the relation of the parties, subject to proponents' objection and exception that it was incompetent and inadmissible. This exception must be sustained. This evidence was inadmissible for the reasons stated respecting the evidence of the witness Taylor, and its admission was error.

■ Hilda Hess, a witness called by contestants, was permitted to give evidence of the contents of what she testified was a copy of a letter that Mrs. Everett sent to her husband from Vevey, Switzerland, in 1919. The exceptions to this, that are briefed, are that it was too remote and immaterial. These exceptions are unavailing. The record shows, however, that the admission of this evidence was excepted to on the further ground that whether what the witness testified was a copy of something written and sent by Mrs. Everett was in fact such, was a mere conclusion of the witness, which appears to have been so. If this was true, the evidence, of course, was inadmissible, but since the question is not briefed it is not considered.

■ Subject to proponent's objection and exception that the evidence had no tendency to show any fact relating to the execution of the instrument in question, decedent's mental capacity or undue influence, one Walter Russell was permitted to testify at length regarding talks he had with decedent about Miss Burnap as bearing on decedent's state of mind. He testified that decedent told him about Miss Burnap in 1918, and requested him to arrange a luncheon at his studio for the purpose of meeting her; that this was done; that later decedent asked him what he thought of her; that he replied, "I think that she is perfectly charming, and I think that all you have said about her is true, she is a very interesting woman. I don't blame you for being very much interested in her"; that decedent replied, in effect, that it was only a business proposition, that she was going abroad to look after his interests in Switzerland, to which witness said: "That is very fine but I am glad that she is going to Europe to attend to your European affairs rather than remain here, for I fear that if she remained here that things wouldn't be just exactly as I would like them or as

the girls would like them.'' The witness characterized this talk as ''just good-natured bantering between good friends.'' He testified further that in 1919 decedent came to his studio and told him that he was very much disturbed about Mary (who was in the hospital) and about letters he had received from Miss Burnap, who was then in Europe, and thereupon the following took place:

"Well, he said, I am worried about it and I am in trouble and he said I just got to marry her and that is all there is to it. Well, I said, hooked then, are you? Well, he said, I don't like that word, hooked. Well, I said, let's look facts in the face. * * * He said, 'By God, Russell, you have gone too far, you have classified the woman I am going to marry as an adventuress,' and he got right up close to me with his eyes two inches from mine and I said, 'Yes, Mr. Everett, but if I have gone too far it is because I am remembering the girls and you are not.'

&ast; &ast; &ast;

"He said, but I have got to, he said, there is no way out of it, she will make a scandal, she said she would, and that would kill Mary, that would be the worst, he said, that would be the worst thing that could happen. I couldn't have any scandal like that in my family.

&ast; &ast; &ast;

"I said, you have, you are not very consistent, Mr. Everett, in getting angry with me and threatening to sever our friendship for what I have said for you in the same breath, bring out these letters and to all intents and purposes classify her as a blackmailer.

&ast; &ast; &ast;

"He said, 'By Jove, I guess you are right, I guess you are right.' He said, 'I am sorry, perhaps we are both very much excited,' to which I said, 'Well, let us sit down then and talk this thing over freely and frankly and very carefully for your threat certainly of your withdrawal of your

friendship to me is a very serious one, I would regret it very much,' * * * * 'Now,' I said, 'if you can go on and we are on it, let us sit down here at a little family conference, let's all be, let's. play act some more, let's have Mary here and Amy and Anne and Guillio and the rest of them here around the table, let's just look into their eyes and hold this family conference, and see if you think this is just exactly the right thing under the circumstances.' He said, 'Here you are speaking of the girls again, how about their love for me and my right to live my life as I would and not be lonesome,' he said, 'I love her, why shouldn't I marry her?' I said, 'Love, you call that love,' I said, 'Why, Mr. Everett, that is nothing but senile decay, ingrowing senility, ask any biologist or any good doctor if this, if the evidence you are now giving of what you call virility and that sort of thing is not the, is not the last flame of a dying passion that always leaps up at such a time as that'; I said, 'Why, Mr. Everett, you are 70 and you are trying to picture yourself as just a nice young buck and gamboling over the lawns in the spring time looking for its mate'; I said, 'Go look in the glass and see yourself and see if that isn't a .true picture of what you are trying to do.' ''

The witness testified that following the latter talk decedent walked the floor for a while and then told witness that he was sorry that he got mad at him, that he thought the witness was right, and asked his advice.

The foregoing evidence had no tendency to show that decedent's mind was then in such condition that it was susceptible to undue influence. He apparently realized that Miss Burnap had grounds for a scandal, which he wished to avoid; he loved her, or thought he did, and could see no reason why he should not marry her. In the circumstances, what he said was as indicative of a normal as of an abnormal mind, and therefore was not "fit to be considered" as a rational basis for inferring the fact contestants were seeking to prove. *Smith* v. *Martin et al., supra,* 93 Vt. at page 129, 106 Atl. 666; *Girard et ux.* v.

*Vermont Mutual Fire Insurance Co.*, 103 Vt. 330, 154 Atl. 666. The evidence was irrelevant and prejudicial and should have been excluded.

The same is true of the evidence respecting the talk the witness had with decedent soon after the talk above referred to regarding an ante-nuptial agreement.

 Evidence of conversation with a deceased person offered to show state of mind of such person at a particular time should be received with great caution, and only such parts of what the witness said as are necessary to an intelligent understanding of what was said by the deceased should be admitted. Here was a most flagrant violation of this rule. It may be noted, too, although the exception is not considered because not briefed, that this evidence was admitted under proponents' exception that they were not bound by what the witness said, or by his conclusion or statement.

The talks which the witness had with decedent in 1923, a part of which appears on pages 11, 12, and 13 of Mrs. Everett's supplemental brief, stand differently.

What decedent then said was indicative of his then state of mind, and tended to show that he might be subject to the domination of his wife.

 H. A. Albyn, a long-time friend of decedent, and for many years in his employ, first in Ohio and later in Bennington, testified that in the fall of 1924 he had a talk with decedent in which decedent told him "that Mr. Burnap (Mrs. Everett's brother) did not like my services and that he was going to ask me to go back to Ohio * * * for my good and his good," and that at the time decedent was rather dejected and in tears. This was admitted to show state of mind of decedent. It was objected to on the ground that it was hearsay, that it had no evidentiary force tending to show state of mind of decedent with respect to the beneficiaries under the will at the time it was made, and that it was simply the basis for an inference from which to draw another inference. While it may have been proper as bearing on decedent's then state of mind, that is, that it was such that he was susceptible to undue influence, to show that he sent the witness away from Bennington contrary to his own wishes, this was as far as it was necessary or permissible to go. It was not competent to show that he acted at the behest of Burnap, since it was not claimed that

he unduly influenced decedent in making the instrument in question. Although it appeared that Burnap received a considerable gratuity from decedent some years before the latter died, and for a time occupied an important position in connection with the Bennington property, it was claimed that this was due to Mrs. Everett's influence over decedent rather than to any influence Burnap had over him. What decedent said on that occasion about Burnap clearly had no tendency to show decedent's then state of mind unless what he said was treated as evidence of the fact stated, and for that purpose it was purely hearsay. In the circumstances, to permit Burnap to be brought into the case in this manner was error, *In re Waterman's Will,* 102 Vt. 443, 447, 150 Atl. 65, and prejudicial to the proponents. While evidence that is admissible for a particular purpose cannot be excluded because it is prejudicial to the opposing party, the fact that Burnap was responsible for the witness's removal, if such was the fact, was immaterial for any legitimate purpose, and in any event could not be proved in this manner.

So, too, what decedent said to Dr. Wing, Amy's husband, in January or February, 1925, about Burnap was erroneously admitted, and requires a reversal. The doctor testified that decedent told him that he was obliged to send Albyn back to Ohio because he was wasteful, played to the gallery, gave out interviews, etc., and that Burnap, who was then in charge of things at Bennington, had opened his eyes as to the wasteful condition that was going on; that decedent said he was sorry to do it, and that the matter seemed to be very much on his mind. This was received to show state of mind of decedent toward Mrs. Everett and Burnap, and was excepted to on the ground that his state of mind toward Burnap was immaterial. Assuming that some parts of this evidence were admissible for the purpose for which it was received, the admission of what related to Burnap cannot be justified under any known rule of evidence.

For the purpose of showing state of mind of decedent, and his then state of affections for his daughters, Amy and Anne, Dr. Wing was permitted to testify to a statement made by decedent the latter part of June, 1925, in Hotel Belmont in New York when the witness, his wife, Mr. and Mrs. Selden, a Mr. Walker, and a Mr. Stewart were present. It was, in substance, that decedent said that he had called them together to

tell them that George Burnap had been exonerated; that he wanted to serve notice on them that he was going to protect his family and any members of Mrs. Everett's family from any attack from any source, and that he wanted to tell them that he had arranged to make trust provisions for the little girls and also additional provisions for his wife. The witness testified that decedent seemed very much agitated at the time. This was objected to as immaterial, etc. We think it was admissible for the purpose for which it was received. It appeared that Burnap had just won a verdict in a suit brought against him in Bennington County wherein he was charged with assault and battery by committing an unnatural sexual act, see *Wittig* v. *Burnap,* 99 Vt. 340, 132 Atl. 39, and decedent apparently thought, whether rightly or not was immaterial, that some of those present were responsible in a measure for the prosecution of that suit, and he evidently took this means of expressing his resentment and wrath. Moreover, the evidence appears to have been harmless to the proponents, since it tended to account for, rather than discredit, the provisions of the will.

██ Mr. Turri was permitted to testify, as bearing on decedent's state of mind, subject to the exception that it was too remote, and had no relation to the making of the will, that decedent told him in January or February, 1920, that Grace (Miss Burnap) was true as steel, and was going to share with him the great sorrow of his life, the death of his first wife; that Mrs. Turri asked decedent if he had told the close relatives that he was going to get married and that, upon being told that he had not, she advised that he do so, and told him that the only thing that she wished was his happiness. The evidentiary force of this testimony is doubtful, but it is not apparent how it could have harmed proponents.

██ ██ Amy Wing was permitted to testify as tending to show decedent's state of mind, subject to objection that it was too remote, that decedent told her in January, 1920, that he was considering dividing a portion of his property between her sisters and herself. This was proper, as against the exception saved, as tending to show decedent's then state of mind toward his daughters. The following answer, which was, in effect, that this was not done, was not excepted to, since the bill of exceptions, page 14, shows that the exception covered only the conversation. It is then said in Mrs. Everett's brief that, ''The

312

same objections and exceptions apply to conversation between the decedent and the witness appearing on pages 1467 to 1508, inclusive, as well as on pages 1509 to 1526, inclusive." We accept this statement as true; and again announce that questions briefed in this manner will not be considered.

 The evidence of Dr. Postle, given by deposition, that he had a talk with decedent in 1925 or 1926 about Albyn, in which decedent said, "He regarded the way that Mr. Albyn was conducting the business and the way he managed it, that he never got his eyes open until Mrs. Everett—meaning the second Mrs. Everett—opened his eyes to what was going around on his farm with Mr. Albyn—the way he managed it." This was received to show state of mind of decedent, subject to proponents' objections and exceptions "that such evidence was purely hearsay, etc.," to quote from Mrs. Everett's brief, and again quoting, "as appears on pages 283-288." Here, again, the briefing is too inadequate to require consideration of the exception. The record referred to shows that several exceptions, other than that the evidence was hearsay, were taken, and we will not search for an appropriate one, if there is such. However, the jury were cautioned at length that they must consider this evidence only for the purpose for which it was received, and not as proof of what decedent stated. While its value for the purpose for which it was admitted, if any, was slight, when limited to that use alone it is not apparent how it was harmful to proponents.

 Anne Selden testified, as bearing on the state of mind of decedent, and subject to the exception that it was immaterial, that he told her during the Christmas holidays in 1918 that he was sending Miss Burnap abroad in the interest of the Green Mountain Home, an institution which he had established at Bennington. This evidence had little value, but we fail to see how it could have harmed proponents.

Following this, the brief states that the same objection and exception was treated as applying to each question and answer relating to conversation between Mr. Everett and the witness appearing on pages 1589 to 1692, both inclusive. For reasons already stated these exceptions are not considered.

 Subject to exception that the evidence was too remote and immaterial, contestants were allowed to introduce in evidence two antenuptial agreements between Mr. Everett and

Miss Burnap, the first dated January 24, 1920, and the second dated February 25, 1920. Although under the terms of each Miss Burnap received $300,000, in trust or outright, the latter was in fact a substitute for the former. They differ somewhat in terms, but provide, in effect, that the provisions therein made for Miss Burnap shall be in lieu of all marital rights she may acquire in Mr. Everett's property, real or personal, if the contemplated marriage is consummated. These instruments were admissible as tending to show the interest or motive Mrs. Everett might have to procure a will favorable to her, if possible, and being admissible for that purpose their admission was not error.

Fred Bliss, called by contestants, testified as bearing on the state of mind of decedent, and subject to exception that it was immaterial and irrelevant, that he had a talk with Mr. and Mrs. Everett in 1921 about Mr. Everett withdrawing from the Everett Building project, as we understand the record, in which Mrs. Everett said that Lye & Company, who were interested in the same project, seemed to be trying to steal $240,000 from Mr. Everett. It is not apparent how this evidence was admissible for the purpose for which it was received, nor is it apparent how it could have harmed proponents.

It appeared in the deposition of Charles L. Flory, taken by contestants, that he was attorney for decedent in 1920, and that as such he received three letters from him relating to a will that decedent had made or was contemplating making directing certain changes, etc. These letters are embodied in the deposition and are marked, 15-1, 15-2 and 16-1. When the deposition was offered in evidence proponents moved that the letters, and all evidence respecting them, be struck out on the ground that such letters and evidence were privileged communications between decedent and his attorney. The motion was overruled and proponents' excepted. We held in In re Healy's Will, 94 Vt. 128, 109 Atl. 19, that communications by a client to his attorney who drafted his will in respect to that document, and all transactions occurring between them leading up to its execution, were not, after the client's death, within the protection of the rule as to privileged communications in a suit between the testator's devises and heirs at law, or other parties who all claim under him. It was held, too, in Thornton's Exrs. v. Thornton's Heirs, 39 Vt. 122, 158, that evidence of previous wills, executed or unexecuted, was admissible. While

Flory had nothing to do about the instrument in question, it is not apparent why instructions regarding changes in the provisions of a previous will are not equally admissible, as far as being privileged is concerned, on either the issue of capacity or undue influence. We think the evidence admissible as against the exception saved. *In re LaProhon, Appellant,* 102 Me. 455, 67 Atl. 317, 10 Ann. Cas. 1115; *In re Young's Estate,* 33 Utah 382, 94 Pac. 731, 17 L. R. A. (N. S.) 108, 126 A. S. R. 843, 14 Ann. Cas. 596; *Glover* v. *Patten,* 165 U. S. 394, 41 L. ed. 760, 17 Sup. Ct. 411; *Brooks* v. *Holden,* 175 Mass. 137, 55 N. E. 802; Wigmore on Evidence, § 2314. Exceptions to the refusal of the court to strike out other parts of Flory's deposition are not considered because inadequately briefed.

In the brief presented on behalf of Mrs. Everett, our attention is called to other exceptions saved by proponents to the admission of evidence, but they are not so briefed as to require or merit consideration. In many instances the brief merely states that the evidence of certain witnesses was received over proponents' objection and exception, and refers to the transcript where it is said such objections and exceptions may be found. An examination of the transcript at the place referred to shows nothing but. "received subject to the same exception" or simply "same exception." This requires a search of the record to ascertain what exceptions were in fact saved, and where several grounds are stated, which is often the case, we are called upon to determine which ground is relied upon. In only a few instances is the substance of the evidence excepted to stated in the brief, but we are referred to the transcript to learn what it is, with no further aid, usually, than something like the following, to quote from the brief: "Transcript, pages 637-653, inc., and pages 664-675, inc." In short, the brief, to a large extent, is nothing more than an index to those parts of the transcript where the exceptions taken, and the testimony and exhibits admitted under exceptions, may be found. This is in no sense a compliance with the requirements of Supreme Court rule 8, and questions so briefed need not be considered. In other words, we are not required to search the record for exceptions on which to reverse a judgment. *Town of Brattleboro* v. *Carpenter,* 104 Vt. 158, 158 Atl. 73; *West Rutland Trust Co.* v. *Houston,* 104 Vt. 204, 158 Atl. 69; *Foss* v. *Sherwood,* 104 Vt. 141, 157 Atl. 834. This rule has been so recently and fre-

quently announced that the profession should understand and heed it.

At the close of contestants' evidence and again at the close of all the evidence, proponents moved for a directed verdict and that the issue of undue influence be withdrawn from the jury on the ground that the evidence did not tend to establish undue influence, both motions were denied, and the proponents excepted.

 Undue influence in this connection means whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammeled desire. It may be caused by physical force, by duress, by threats, or by importunity. It may arise from persistent and unrelaxed efforts in the establishment or maintenance of conditions intolerable to the particular individual. It may result from conduct designed to create an irresistible ascendency by imperceptible means. It may be exerted by deceptive devices without actual fraud. Any species of coercion, whether physical, mental, or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute undue influence. Its extent or degree is inconsequential as long as it is sufficient to substitute the dominating purpose of another for the free expression of the wishes of the person signing the instrument. The nature of undue influence is such that it often works in veiled and secret ways, hence it is impossible to lay down any hard and fast rule by which its exercises must or may be manifested. Direct evidence of it is seldom available. Nor is this necessary, since it may be shown by circumstances which have a legitimate tendency to prove that it was used. *Smith's Exr.* v. *Smith,* 67 Vt. 443, 32 Atl. 255; *Goff* v. *Clinton* (R. I.), 163 Atl. 747. The nature of the testamentary disposition as we have seen whether natural or unnatural, may be considered in connection with other evidence under the issue of undue influence. *In re Estate of Martin,* 92 Vt. 362, 104 Atl. 100. Opportunity must necessarily be shown, but opportunity alone does not justify the inference of undue influence. Furthermore, influence by whatever means exerted, and however urgent and persistent, will not suffice to avoid a will unless carried to the point of destroying the free agency of the testator. Neither suggestion, solicitation, advice, nor importunity, unless carried to the extent indicated, will avoid a will. *In re Bean's Will,*

85 Vt. 452, 458, 82 Atl. 734. This is especially true when, as here, the person charged with undue influence is the spouse of the decedent. Their relation is such that a greater latitude in the influence either may exert over the other without its becoming undue in the eyes of the law is recognized. But even here, if the influence is such as to destroy the free agency of the one executing the instrument by supplanting his or her will by that of the other, it will vitiate the act.

The determination of the motion requires an examination of the evidence which is too voluminous to permit reference to any considerable part of it, but it tended to show, among other things, these facts: Prior to decedent's marriage to Miss Burnap the relations between him and all of his daughters and their families were very harmonious, they were apparently "pals" as one daughter expressed it. Mary, who lived in Italy, wrote her father every day for more than two years after her mother died, and these letters and his replies indicate that the parties were on most affectionate terms. The other two daughters lived in this country, saw their father frequently, and the relations between them appeared equally affectionate. Shortly after decedent's second marriage there was a marked change in the relations between him and his daughters. Mrs. Everett pursued a course well calculated to bring this about, and the record indicates that she accomplished that end. To the decedent, and to others, she accused his daughters of being quarrelsome, heartless, selfish, and disloyal to their father; she told various persons that all they cared for him was what they could get out of him; she deeply resented any mention by them of their mother's name in his presence, and said that she would put a stop to it. Conditions were such in 1921 that decedent ordered Anne out of the Bennington home, although the order was not enforced. On one occasion Anne tried to get an explanation of the situation, and when Mrs. Everett refused to talk she appealed to her father whereupon Mrs. Everett said: "This pertains to me, and your father shall not speak without my permission." Mrs. Everett, without any apparent reason for it, created such a feeling on the part of the decedent towards the Turris following the birth of Grace Elizabeth that there was an open breach between them. While this trouble was fixed up in a measure, Mrs. Everett's attitude toward her husband and Mrs. Turri is shown by what she said the day the Turris

sailed for home. Mr. Everett was speaking about returning to the Turris certain pictures which the evidence tended to show belonged to them. Mrs. Everett said to Mrs. Turri: "Mr. Everett will give or do nothing without my consent. * * * * When Mr. Everett dies, if you get those pictures, they will be valued, and their value at that time will be taken from your portion of his estate."

Mr. Everett never wrote Mrs. Turri after 1925, and Mrs. Everett's explanation for this to Mrs. Turri in 1928 was that Mr. Everett "considered me dead, you understand, dead, and all my letters and presents were never opened, and we never spoke of you." And in July, 1927, Mrs. Everett, in speaking to Mrs. Wing regarding a present she, and Mr. Everett received from Mrs. Turri the preceding Christmas, said Mr. Everett asked her to open it and she refused, and he would not open it, "and here * * * * the package has laid ever since like a snake and no one will touch it." The relations between the decedent and the Wings were less strained, but they were by no means friendly. The decedent had given his daughters at various times prior to his second marriage, or shortly thereafter, stocks, etc., to the amount of approximately $150,000 each, which in the aggregate was somewhat less than he received from their mother's estate. He never gave them anything to speak of after that, although he once told Mrs. Wing that he was going to divide a portion of his property between her and her sisters.

At the time of his second marriage decedent had in his employ various persons who had been in his service for years, and in whom he appeared to have implicit confidence. Many of these were removed under circumstances that indicated that it was contrary to the decedent's wishes. Decedent had established the Green Mountain Home for Boys in Bennington, in which he took great pride. Mrs. Everett regarded this a "scandal" and a "nest of degradation," and said that she had put her foot down and made Mr. Everett close it. In 1920, Mr. Everett and others, were arranging to erect a large building in New York City to be known as the "Everett Building." Mrs. Everett was opposed to this, and told one Russell that Mr. Everett had got to withdraw from it, and although he seriously objected to doing so, he yielded to her wishes, and abandoned the project. Indicative of her real regard and feeling for Mr. Everett was the fact that she called him a "cur"

and a vile name in the presence of one of his employees in the summer of 1920, only a few months after they were married; and on another occasion about the same time so conducted herself that he thought that she had committed suicide. The same summer she told Mrs. Wing that she was not happy and thought she would leave her father, and she told Albyn that "she was afraid he was going broke" and that "she had quite a proposition on her hands with that old man and she didn't think it was hardly worth going ahead with," etc., and less than three months before the instrument in question was made told Dr. Wing practically the same thing. The day following Anne's wedding, in November, 1921, Mrs. Everett hurriedly ordered the automobile, and when it arrived at the door she and Mr. Everett came out of the house, he was crying, and asked her where she was going. She made no reply, but told the operator to "Drive on." After the car started she said to the driver, "God, think of the Hell I have gone through with that old man." In 1920, she told Mrs. Ferguson, in effect, that if one had money they could do anything in the world; and told Miss Morier that "she was not beautiful, but she could always get what she was after." By the end of 1920 she had received from Mr. Everett, in trust and otherwise, including the amount covered by the antenuptial agreement, approximately $400,000. The following year she received stocks valued at $30,000, and a part of the Bennington property was conveyed to the E. H. Everett Company on terms very favorable to her. In August, 1922, she tried to persuade Mr. Everett's lawyer, Mr. Flory, to get Everett to establish a trust for her two children, one of which she was then expecting, and make her trustee. October 8, following, she received notice at Bennington that Mr. Everett was to be operated on the next day in a New York hospital. She started for New York immediately and said to Albyn that "She didn't know what would be pulled off by the girls with him if she wasn't there under those circumstances" * * * *; that after all she had gone through with, she didn't mean to have somebody else slipping in and arranging wills or anything of that kind." Mr. Everett remained in the hospital until December 2. On November 21, a trust of $100,000 was created for each of the young children, but the income from both funds was payable to Mrs. Everett during her life; and three days after Mr. Everett left the hospital the Washington residence,

or an interest therein valued at $400,000, was conveyed to Mrs. Everett, and three weeks later he gave her jewelry valued at upwards of $78,000.

Passing over numerous smaller gifts by decedent to his wife, it appeared that in 1925 he conveyed to her the balance of the interest in the Washington residence valued at $400,000 and gave her stocks in various corporations valued at $546,000. In March, 1927, Mrs. Everett wrote the trust company that held the trusts for the girls asking to be notified if there was any contemplated change in the funds, and later wrote intimating that some changes which had been made had not turned out well. On May 6, 1927, she had an interview with Dr. Wing in which she told him that she had practically made up her mind to leave Mr. Everett; that she was disturbed about his financial affairs and his *business judgment;* that he kept busy all of the time, but she didn't feel very confident about what he did; that she was afraid that he had lost a great deal of money dealing with Harriman & Co.; that she didn't believe him shrewd enough *any more* to deal with those men, and that she was worried about the future and the provision he had made for her and the girls. In view of the fact that under the antenuptial agreement Mrs. Everett would receive nothing from her husband's estate unless he provided otherwise by will, what she said to Dr. Wing about leaving him, her doubt about his business judgment and shrewdness, his failure to make what she deemed to be suitable provisions for herself and the girls, etc., and the execution of the instrument in question within three months thereafter are significant circumstances bearing on the question of undue influence in the making of such instrument.

A large amount of evidence was introduced tending to show the state of mind of decedent at different times during the period under investigation. While it did not tend to show that at the time the instrument in question was made he lacked testamentary capacity in the sense that he was incapable of making a will if left to his own untrammeled wishes in the matter, it did tend to show that Mrs. Everett had succeeded in implanting in his mind a feeling of ill will, bordering on hatred, towards his older daughters, which continued to the time the instrument was made, and that she, by various means, had acquired such control over him that his acts and conduct regarding his busi-

ness affairs, whether large or small, reflected her will respecting the same, whenever she sought to exert it, rather than his own.

Without further reference to the evidence, or what it tended to show, we are satisfied that taken as a whole, the evidence clearly made a case for the jury on the issue of undue influence.

While there was no direct evidence of such influence, that, as we have seen was not necessary. Circumstantial evidence is often more satisfactory than direct evidence, and in the instant case it tended to support the claim of the contestants. The motions were properly denied.

Mrs. Everett briefs one exception to the charge and two exceptions, Nos. 5 and 6, to the refusal of the court to charge as requested. These exceptions are without merit. The first two have to do with the issue of testamentary capacity alone and disregard the element of undue influence; and the charge taken as a whole, as it must be, substantially covers what is embodied in the second request to charge.

After verdict, and before judgment, proponents moved to set aside the verdict on several grounds; the motion was denied, and they excepted. The only ground of the motion briefed is that "said verdict is the result of passion, prejudice and bias, resulting from the improper and prejudicial use in argument by counsel for contestants, of evidence as establishing unqualified and independent facts, which was admitted specifically and solely for the limited purpose of showing the state of mind of the testator ·at the time the will in question was executed."

No exception now relied upon was taken to the argument, and, so far as appears, no complaint respecting it was made by proponents until after the verdict was returned.

That a verdict may be set aside, in certain instances, because of improper argument of counsel is well established in this State. *Smith Woolen Machine Co.* v. *Holden*, 73 Vt. 396, 51 Atl. 2; *Lockwood* v. *Fletcher*, 74 Vt. 72, 52 Atl. 119; *Sears* v. *Duling*, 79 Vt. 334, 65 Atl. 90; *Fraser* v. *Blanchard et al.*, 83 Vt. 144, 73 Atl. 995; *Fadden* v. *McKinney et al.*, 87 Vt. 316, 89 Atl. 351; *Taplin & Rowell* v. *Stanley*, 102 Vt. 398, 148 Atl. 750. But in each of these cases it appears that the claimed improper conduct was seasonably objected to, so that the court, as well as the claimed offender, had an opportunity to correct the error, if any, so far as possible.

The failure to interpose an objection to improper argument is held ground for denying such a motion as this in *Powers* v. *Mitchell,* 77 Me. 369; *Mizula & Cherepowitch* v. *Sawyer,* 130 Me. 428, 157 Atl. 239; *State* v. *Hull,* 18 R. I. 207, 26 Atl. 191, 20 L. R. A. 609; *McKiernan* v. *Lehmarer,* 85 Conn. 111, 81 Atl. 969; *Spahn* v. *People's Railway Co.,* 3 Boyce (26 Del.) 302, 323, 83 Atl. 27; *Learned* v. *Hall,* 133 Mass. 417. See, too, *Fadden* v. *McKinney et al., supra,* 87 Vt. at page 326, 89 Atl. 351; Thompson on Trials (2nd ed.), Vol. I, par. 957; Hyatt on Trials, Vol. II, par. 1482.

We held in *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 152, 130 Atl. 758, that under a motion of this nature improper or inflammatory argument, although not excepted to at the time, has evidentiary value the effect of which it is the duty of the trial court to consider, along with all the other circumstances of the trial. But the weight to be given to it is for the court, as triers of the fact, to determine. *Gomez* v. *Lawson* (decided at the present term), 105 Vt. 353, 166 Atl. 14. The contrary not appearing, it will be presumed that all the evidence bearing on the issue presented by the motion received due consideration, *McClary* v. *Hubbard,* 97 Vt. 222, 237, 122 Atl. 469, and that proper use was made of it. *Raithel* v. *Hall,* 99 Vt. 65, 74, 130 Atl. 749; *Lynch's Admr.* v. *Murray,* 86 Vt. 1, 13, 83 Atl. 746. By the denial of the motion the court impliedly found that the jury was not influenced by the argument.

The ruling was one resting in the court's discretion. *Woodhouse* v. *Woodhouse, supra,* 99 Vt. at page 153, 130 Atl. 758, and, as we have seen, there was evidence amply sufficient to support the verdict. Abuse of discretion does not appear and the exception is not sustained.

This disposes of all questions so briefed as to require consideration.

*Judgment reversed, and cause remanded.*

### Opinion on Motion for Reargument*

After the foregoing opinion was handed down, counsel for the contestants had leave to file a motion for reargument, pending which the entry of judgment has been withheld. The motion, which in fact is a motion and brief combined, covers

*Opinion on reargument filed June 16, 1933.

seventy-eight printed pages. It has been argued at length by counsel for contestants. Counsel for Mrs. Everett has done nothing either by way of answer or argument to aid us in solving the questions presented.

Five grounds for reversal are stated in the opinion. The motion asks leave to reargue all of these. The questions are considered in the order in which they are presented.

 (1) The opinion holds that certain evidence of one McNaney regarding the conduct of decedent and Miss Burnap, later Mrs. Everett, while on an automobile trip in the summer of 1918 was inadmissible for the reason that it did not fairly justify the inference that the parties committed an immoral act on that occasion, and that it did not appear which party was to blame, if they did. The opinion fails to notice one circumstance which the witness testified occurred on that trip, namely, that about ten minutes before the parties left the automobile the second time he looked back and saw Mr. Everett pull his hand out from under Miss Burnap's clothing. To give this evidence any effect as tending to show that an immoral act was committed on that trip, it must be inferred that by "clothing" the witness meant dress or skirts. Given that meaning, the evidence, in view of the mature age of the parties and the presence of the chauffeur who they must have known could observe their conduct by simply turning his head, is too improbable to merit serious consideration. Moreover, since a meaning consistent with innocence may just as reasonably be drawn from this evidence, it adds little, if anything, to contestant's claim. *Girard et ux.* v. *Vermont Mutual Fire Ins. Co.*, 103 Vt. 330, 336, 154 Atl. 666. We still think that the evidence as a whole failed to justify the inference that the parties had sexual intercourse on that trip. Assuming, however, that it did tend to show that, it tended to show that Mr. Everett, and not Miss Burnap, was the seducer. It is urged by contestants that since the evidence tended to show undue influence on the part of Mrs. Everett after the parties were married, evidence of illicit relations between them before marriage was competent, irrespective of who was responsible therefor. To this we cannot agree, in the circumstances disclosed in this case. If such relations resulted from the advances and importunities of decedent, they had no tendency, either standing alone or weighed in connection with the other circumstances to which our attention is called, to show

that his "process of mental decay had so far progressed that he was 'putty' " in the hands of Miss Burnap at that time, or that his mentality was then such that he was susceptible to her influence.

Contestants call attention to Underhill on the Law of Wills, Vol. I, par. 148, and many cases, among which are: *Snyder* v. *Erwin*, 229 Pa. 644, 79 Atl. 124, 140 A. S. R. 737; *Griffith* v. *Benzinger*, 144 Md. 575, 125 Atl. 512; *Hobson* v. *Morgan*, 215 Ala. 274, 110 So. 406; *Pendell* v. *Apodaca* (Tex. Civ. App.), 221 S. W. 682; *Saxton* v. *Krumm*, 107 Md. 393, 68 Atl. 1056, 17 L. R. A. (N. S.) 477, 126 A. S. R. 393; *Hyatt* v. *Wroten*, 184 Ark. 847, 43 S. W. (2d) 726; and *Norton* v. *Clark*, 153 Ill. 557, 97 N. E. 1079; in support of their claim that the admissibility of this evidence, did not depend upon who was to blame for the illicit relations, if they existed. Underhill states the rule thus: "Evidence of illicit relations between the parties before their intermarriage, particularly if either of the parties were married at the time, is always relevant, though never controlling or conclusive of undue influence." Assuming that the evidence tended to show illicit relations between the parties, the Underhill rule, literally construed, is broad enough to justify its admission. But the cases cited by him in support of this rule, *Maynard* v. *Tyler*, 168 Mass. 107, 46 N. E. 413, and *Potter's Appeal*, 53 Mich. 106, 18 N. W. 575, and those cited by contestants, are so unlike the instant case, in point of fact, that they give little support, if any, either to the rule or to contestants' claim. In most, if not all, of the latter cases the testator and legatee never intermarried, but lived in adulterous or illicit relations for many years, and were so living when the instrument in question was executed. In the instant case, giving contestants the benefit of all that they claim, the evidence tended to show only three instances of immoral conduct between the parties prior to their marriage, covering a period of one and one-half years. Neither party was married at the time. Later they intermarried and lived together as lawful husband and wife more than seven years before the alleged will was made, and until decedent died, about a year and nine months thereafter. In the meantime they had two children who are still living. In the circumstances, evidence of such illicit relations between the parties before marriage as contestants claim the evidence tended to show was incompetent and inadmissible in

the absence of any showing that Miss Burnap was responsible for such relations. In *Pierce* v. *Pierce,* 38 Mich. 412, a case quite similar in point of fact to this one, the court, of which the late Judge Cooley was then a member, said: "And whether the original relations of the parties were blameless or not, the attempt to go back of many years of marriage for the purpose of raking up some discreditable transaction receives no support in law, for there can be no reasonable inference of future wrong legitimately drawn from it. Neither can it be fairly inferred that the woman was the seducing party." In the last sentence of the quotation, the court recognizes the rule which we announced in the original opinion and have here restated. While evidence of illicit relations between the parties before their intermarriage may be admissible in some cases on the issue of undue influence, without proof that the legatee was responsible for such relations, no case has come to our attention, and we doubt if one can be found, where it has been so held in circumstances similar to those shown in the instant case.

It is claimed that in reaching the conclusion expressed in the opinion regarding the admissibility of this evidence, we isolated the incidents of this trip from other facts giving significance to the relationship of the parties before their marriage; that we misapprehended the purpose for which this evidence was offered and received; and that we overlooked many circumstances, which are enumerated in the motion, that had a bearing on its admissibility. This claim has no foundation whatever. We were fully aware of the purpose for which this evidence was admitted, and our conclusion was reached after a thorough examination of all the evidence in its various aspects. The age of the respective parties, the financial status of each, the gifts by decedent to Miss Burnap before marriage, etc., were all considered.

(2) The opinion holds that certain evidence of Walter Russell ending with the quotation from his testmony therein set forth had no tendency to show that decedent's mind was then in such condition that it was susceptible to undue influence. It is claimed that in arriving at this conclusion we overlooked or misapprehended the significance of "mental submission and impotency to resist shown by decedent's declarations," "that he did not see any possible way to avoid it" (marrying Miss Burnap); that he had "just got to marry her and that is all

there is to it," and that "there is no way out of it, she will make a scandal." These declarations were neither overlooked nor misapprehended. They were considered in connection with all the material parts of that conversation, and a re-examination of the question since receiving contestants' motion confirms our conclusion as expressed in the opinion.

The talk that the witness had with decedent regarding an antenuptial contract, which is held inadmissible, occurred soon after the talk above referred to that took place in the witness' studio. This has been made clear in the opinion. None of the talk in 1923, a part of which appears on pages 11, 12, and 13 of Mrs. Everett's supplemental brief, was held inadmissible, so what is said in the motion regarding that is of no consequence. This talk was objected to as a whole, and since some parts of it were admissible the whole must stand. See *In re Wells' Will; Page* v. *Cave,* and *McCurdy* v. *Flibotte,* cited in the opinion.

(3) The holding that the evidence of H. A. Albyn that decedent told him in the fall of 1924 that Mr. Burnap did not like Albyn's services and that decedent was going to ask Albyn to return to Ohio, etc., was inadmissible, is vigorously assailed. It is said that the evidence tended to show decedent's "mental incapacity to resist pressure and deceit in general; and mental subjection to Mrs. Everett and her brother," etc. One answer to this not stated in the opinion is that there was no claim that at that time decedent lacked mental capacity to resist pressure and deceit *in general;* nor could there well have been in view of the undisputed evidence that he was then worth several million dollars and was connected with various large business enterprises which he appears to have operated successfully. On the other hand the case was tried from start to finish on the theory that decedent was completely dominated by his wife; that he sacrificed everything, family, friends and business associates, to please her; and that no one, not even his own daughters, could influence him to do anything contrary to her wishes. In the circumstances the claim of his incapacity to resist pressure generally or that he was under the influence of Burnap appears to be an afterthought.

It is said that the fact that Burnap's name was connected with this evidence could not have injuriously affected the rights of the parties. Evidently the contestants thought otherwise

when they insisted upon taking it over objection. And we think otherwise. Burnap was Mrs. Everett's brother, and to place him before the jury, even in the way in which it was done, as attempting to sever the friendly relations between decedent and one of his old employees, could not have failed to prejudice her case.

It is said that Albyn's removal was shown by other evidence to have been caused by Mrs. Everett. It was. It is said, too, that the evidence tended to show that there was no cause for his removal. It did. But these circumstances taken alone, or together, did not lessen the prejudicial effect of Albyn's testimony regarding Burnap or furnish any basis for its admission.

It is claimed that we overlooked the circumstances which connected Burnap with the "inflamed condition of mind of decedent" about him which led to his election as a director and vice-president of the Edward H. Everett Company, and in connection with the Witig case and the Belmont conference. None of these circumstances were overlooked. Neither did we overlook the fact that it was claimed that decedent's recognition of Burnap in various ways was due to the influence of Mrs. Everett and not to the influence of Burnap.

We have carefully examined all phases of this question, and the authorities submitted in support of the motion, and find no occasion to doubt the correctness of the view expressed in the opinion regarding the inadmissibility of this evidence.

(4) What has been said regarding the evidence of Albyn applies with equal force to the evidence of Dr. Wing respecting what decedent told him about Burnap in their talk early in 1925 and need not be restated. The only part of the evidence of either witness that was admissible to show the then state of mind of the decedent, the sole purpose for which it was offered and received, was that which tended to show that he removed Albyn contrary to his own wishes, and that he felt badly about it. And since it has been claimed from the outset, and is now claimed, that Mrs. Everett was responsible for Albyn's removal, the only purpose that could have been served by connecting Burnap with it was to prejudice the jury against him. While the *Waterman Will* case, 102 Vt. 443, 150 Atl. 65, differs somewhat from this case, in point of fact, we still think that it supports our conclusion as to this evidence. But be that as it may, we are satisfied that the evidence of both Albyn and

Wing so far as it implicated Burnap with Albyn's removal was improperly admitted.

(5) It is claimed in the motion that the question of the admissibility of Anne Selden's evidence on redirect examination was not briefed, or that it was not done in such a way as to require notice by the contestants. That the brief presented in behalf of Mrs. Everett was not as helpful to opposing counsel, or to the Court, as it might, or should have been, may be gathered from what we have previously said; and upon a re-examination thereof we are inclined to think that there is merit in contestants' claim. But since the result of the motion does not depend upon the determination of this question, or the determination of the admissibility of this evidence on redirect examination, and since the same question is not likely to arise on a retrial, we give the matter no further consideration. What is said respecting it in the opinion has been omitted therefrom.

Upon a review of the questions involved, examined in the light of the various suggestions of counsel in support of the motion, we are satisfied that the result reached in the original opinion regarding the first four questions is correct. The motion calls attention to nothing that would justify the ordering of a reargument on these questions, and the fifth question has been disposed of as above stated.

*Motion denied. Let full entry order go down at once.*